[No. 72485-7. En Banc.]
Argued November 21, 2002. Decided November 10, 2004.

*In the Matter of the Personal Restraint of* CHRISTOPHER A. ORANGE, *Petitioner.*

*Sheryl G. McCloud*, for petitioner.

*Steven M. Lowe, Prosecuting Attorney*, and *Frank W. Jenny II, Deputy*, and *James F. Bell* (of *Roach & Petersen, L.L.P.*), for respondent.

*Marshall J. Nelson, Michele L. Earl-Hubbard*, and *Jeffrey L. Fisher* on behalf of Allied Daily Newspapers of Washington, Cowles Publishing Company, Seattle Post-Intelligencer, Tacoma News Tribune, The Daily Herald Company, and The Seattle Times Company, amici curiae.

OWENS, J. — In this personal restraint petition, we are asked to decide whether the trial court's closure of the courtroom during voir dire violated defendant Christopher A. Orange's constitutional right to a public trial and, if so, whether the error, raised on collateral review, necessitates remand for a new trial. We also must decide whether Orange's convictions for first degree attempted murder and first degree assault of the same victim, Marcel Walker, violated the double jeopardy clauses of the state and federal constitutions. Additionally, as to Orange's convictions for first degree murder of Brandy McClure and first degree

attempted murder of Walker, we must determine whether double jeopardy was violated and, if it was not, whether the imposition of consecutive sentences for those crimes was improper.

The Court of Appeals rejected Orange's arguments on all three issues and denied his personal restraint petition. We reverse on two of the three questions presented. First, we conclude that the trial court violated Orange's constitutional right to a public trial. Because the error would have been per se prejudicial on appeal, the failure of Orange's appellate counsel to raise the issue below constituted ineffective assistance of counsel. The relief for this error is remand for a new trial. Although a new trial will undoubtedly place on the affected community an extremely difficult burden, a burden that will be particularly painful for the families and friends of the victims of the crimes charged in this case, our duty under the constitution is to ensure that, absent a closure order narrowly drawn to protect a clearly identified compelling interest, a trial court may not exclude the public or press from any stage of a criminal trial; in this case, neither the size of the courtroom nor a general concern for security provided an adequate basis for compromising the fundamental tenet "that an accused is *at the very least* entitled to have his friends, relatives and counsel present, *no matter with what offense he may be charged." In re Oliver*, 333 U.S. 257, 271-72, 68 S. Ct. 499, 92 L. Ed. 2d 682 (1948) (emphasis added). Second, with respect to Orange's convictions for first degree attempted murder and first degree assault of Walker, we hold that the constitutional prohibition against double jeopardy was violated, necessitating dismissal of one of the charges. Finally, for purposes of guidance on retrial, we hold that Orange's convictions for first degree murder of McClure and first degree attempted murder of Walker did not violate double jeopardy, nor was the trial court's imposition of consecutive sentences for those crimes improper.

## FACTS

On October 6, 1994, Orange drove into an Exxon station in Pasco and fired at least 11 shots, emptying his handgun. One bullet struck and killed Brandy McClure, another struck and wounded Marcel Walker, and a third pierced the clothing of Robyn Willer. The State charged Orange with 11 criminal counts: first degree murder of McClure, first degree attempted murder of Walker, first degree assault of Walker and Willer, and reckless endangerment of Willer and six others in the vicinity of the shooting.

At the opening of trial on April 26, 1995, the court discussed with counsel the method for conducting voir dire. Acknowledging that the prospective jurors had completed a lengthy questionnaire, the trial judge explained that they would be interviewed in chambers on eight of the questions—those asking them about past crimes, pretrial publicity, and familiarity with the Orange family's reputation. As the trial judge told counsel, "The rest of [voir dire] you can conduct in open court." Verbatim Report of Proceedings (Trial) (VRP) at 2. Encouraging counsel to use the answers in the questionnaires "as a springboard for further inquiry," the judge warned that he would interrupt counsel if either merely asked jurors the same questions included in the questionnaires. *Id.* at 5. With that, the following discussion ensued:

> [THE COURT:] We've been talking—or been asked to discuss the family members of the Oranges being here during the selection of the jury. My only difficulty I have here with that is that this entire courtroom will be filled with the venire, and I don't think I have any place, until we get the jury, for the family to be present, Mr. Egan.
>
> MR. EGAN [defense counsel]: Would it be possible, Your Honor, to have the family seated at the bench alongside the wall of the courtroom.
>
> THE COURT: No or not in my lap either.
>
> MR. EGAN: Would it be all right if they took the back. The family has a significant interest.

THE COURT: I understand it. The trouble with it is the limitations of space. Number one, it would be impossible for me to separate the family from the jurors. Number two, I probably wouldn't even have a place for the family to sit as we select the jury. I understand their concerns and this three-week trial they will be here every inch of the way. But in this process, I just have to play it pretty tough, and I'm going to ask the family—they will have to sit outside.

MR. EGAN: As the process we[nd]s on, Your Honor, and as individual jurors may be excused for cause and space becomes available, will they then be allowed, if there is a bench that can be available to them.

THE COURT: We can reexplore this issue. You bet.

MR. COX [deputy prosecutor]: Your Honor, along the same lines the McClure family has also asked to be present during the jury selection. I have told them there may not be room for them. I'm sure if the Orange family is going to be present for part of the jury selection the McClure family will also want to be in here. And if the Orange family is entitled to it the McClure family—

THE COURT: Yes, it adds to the problem. *I am ruling* no family members, no spectators will be permitted in this court-room during the selection of the jury because of the limitation of space, security, etcetera [sic]. *That's my ruling.*

*Id.* at 6-7 (emphasis added). After attending to further housekeeping matters, the trial judge returned to the issue of courtroom space:

All right. Gentlemen, I think this was worthwhile and the jury will be here. The family, of course, they [i.e., the prospective jurors] will have to utilize this area, and I certainly apologize that we don't have the facilities for all of the families who are definitely interested, concerned to be here throughout the entire trial, but when the jury is selected, well, we will have [a] lot of room and evidence will be produced at that time, and you may attend.

*Id.* at 41. The court made no written findings on the issue of courtroom space.

Voir dire began after the midmorning recess on Wednesday, April 26, 1995, continued on Thursday and Friday, and

concluded on Monday, May 1. Closing arguments were delivered two weeks later on May 15. Returning its verdict the following day, the jury found Orange guilty on all but the last three counts of reckless endangerment. Orange was sentenced on the eight guilty verdicts on July 11, 1995. The court ordered that his sentences for first degree murder of McClure, first degree attempted murder of Walker, and first degree assault of Willer be served consecutively. The court further provided that Orange's sentence for first degree assault of Walker would be served concurrently with his sentence for first degree attempted murder of Walker.

Orange appealed. The Court of Appeals affirmed his convictions in an unpublished decision. *State v. Orange*, noted at 97 Wn. App. 1092, 1999 WL 1044204, 1999 Wash. App. LEXIS 3200 (finding no error in trial court's exclusion of evidence of victim's reputation for bad acts and declining to order new trial based on deficient self-defense instruction requested by defendant), *review denied*, 140 Wn.2d 1015 (2000).

Orange filed a personal restraint petition on February 21, 2001. The Court of Appeals denied the petition in an unpublished decision. *In re Pers. Restraint of Orange*, noted at 110 Wn. App. 1086, 2002 WL 508351, 2002 Wash. App. LEXIS 1667. We granted Orange's motion for discretionary review. After hearing oral argument on November 21, 2002, we ordered a reference hearing to determine the effect of the trial court's ruling on courtroom closure. The record and findings from that hearing, held before Franklin County Superior Court Judge Robert G. Swisher, were received on February 2003, and supplemental briefing was completed two months later.

## ISSUES

(1) Did the trial court's closure of the courtroom during voir dire violate Orange's constitutional right to a public trial? If so, is the remedy for the error remand for a new trial?

(2) Did Orange's convictions for first degree attempted murder of Walker and first degree assault of Walker violate double jeopardy?

(3) Did Orange's convictions for first degree murder of McClure and first degree attempted murder of Walker violate double jeopardy? If not, was the imposition of consecutive sentences for those crimes improper?

## ANALYSIS

■ *Standard of Review.* In his personal restraint petition, Orange claims constitutional error. To obtain relief through a personal restraint petition, a petitioner claiming constitutional error must show that such an error was made and that it "worked to his actual and substantial prejudice." *In re Pers. Restraint of Lile*, 100 Wn.2d 224, 225, 668 P.2d 581 (1983). The petitioner bears the burden of establishing prejudice by a preponderance of the evidence, but that burden "may be waived where the error gives rise to a conclusive presumption of prejudice." *In re Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 328, 823 P.2d 492 (1992). The *St. Pierre* court explicitly rejected, however, the suggestion made in prior dicta that constitutional errors that are per se prejudicial on direct appeal "will also be presumed prejudicial for the purposes of personal restraint petitions." *Id.*

■■ *Closure of Courtroom During Voir Dire.* Article I, section 22 of the Washington State Constitution guarantees that "[i]n criminal prosecutions the accused shall have the right . . . to have a speedy public trial." *See also* U.S. Const. amend. VI (providing that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial"). The guaranty of open criminal proceedings extends to "[t]he process of juror selection," which "is itself a matter of importance, not simply to the adversaries but to the criminal justice system." *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 505, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984). As this court has stated, "[a]lthough the public trial right

may not be absolute, protection of this basic constitutional right clearly calls for a trial court to *resist* a closure motion *except under the most unusual circumstances." State v. Bone-Club*, 128 Wn.2d 254, 259, 906 P.2d 325 (1995) (emphasis added). In *Bone-Club*, the defendant argued that "the temporary, full closure of his pretrial suppression hearing during the testimony of the undercover police officer violated his [public trial right]." *Id.* at 257. We agreed and unanimously held that, to protect a defendant's article I, section 22 constitutional right to a public trial, a trial court faced with a closure request must apply the "strict, well-defined standard" previously prescribed to protect the public's article I, section 10 right to open proceedings. *Id.* at 258; WASH. CONST. art. I, § 10 (providing that "[j]ustice in all cases shall be administered openly"); *see Federated Publ'ns, Inc. v. Kurtz*, 94 Wn.2d 51, 62-64, 615 P.2d 440 (1980) (balancing defendant's and public's competing constitutional interests by applying five "workable guidelines" drawn from "principles suggested" in *Gannett Co. v. De-Pasquale*, 443 U.S. 368, 400-03, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979) (Powell, J., concurring)); *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982) (interpreting *Kurtz* guidelines and concluding that trial court's denial of access to hearing and records violated standard); *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 210-12, 848 P.2d 1258 (1993) (declaring unconstitutional a statute precluding compliance with *Ishikawa* guidelines); *see also Dreiling v. Jain*, 151 Wn.2d 900, 93 P.3d 861 (2004) (applying *Ishikawa* guidelines to sealing of materials filed in support of motion to terminate shareholders' derivative suit).

As the *Bone-Club* court acknowledged, its decision to apply the closure test used in the prior article I, section 10 decisions "mirror[ed]" the United States Supreme Court's decision in *Waller v. Georgia*, 467 U.S. 39, 45-47, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984). 128 Wn.2d at 259-60. There, basing its analysis of a defendant's Sixth Amendment right to a public trial on prior decisions addressing the public's

First Amendment right to open hearings, the Court recalled its previously articulated First Amendment test: " 'The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " *Waller*, 467 U.S. at 45 (quoting *Press-Enter.*, 464 U.S. at 510). The Court determined that "the party seeking to close the hearing *must* advance an overriding interest that is likely to be prejudiced, the closure *must* be no broader than necessary to protect that interest, the trial court *must* consider reasonable alternatives to closing the proceeding, and it *must* make findings adequate to support the closure." 467 U.S. at 48 (emphasis added). Thus, the *Waller* test encompasses the proponent's "reason" for seeking the closure (the protection of an overriding interest), the "scope" of the closure (the narrow tailoring of the order), and "three procedural requirements" (holding a hearing, making specific factual findings, and considering reasonable alternatives). *United States v. Sherlock*, 962 F.2d 1349, 1357-59 (9th Cir. 1992).

The five guidelines developed in our article I, section 10 cases and embraced in *Bone-Club* comply with the *Waller* requirements. The *Bone-Club* decision quoted the *Eikenberry* court's statement of the guidelines:

"1. The proponent of closure . . . *must* make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.

2. Anyone present when the closure motion is made *must* be given an opportunity to object to the closure.

3. The proposed method for curtailing open access *must* be the least restrictive means available for protecting the threatened interests.

4. The court *must* weigh the competing interests of the proponent of closure and the public.

5. The order *must* be no broader in its application or duration than necessary to serve its purpose."

128 Wn.2d at 258-59 (emphasis added) (alteration in original) (quoting *Eikenberry*, 121 Wn.2d at 210-11). The first *Bone-Club* guideline parallels the *Waller* requirement that the proponent must articulate an overriding interest; the third and fifth guidelines require, as in *Waller*, a narrow tailoring of the closure order to permit only the most minimal encroachment upon the defendant's public trial right; and the second guideline makes explicit the implicit *Waller* requirement that a hearing be held. The fourth *Bone-Club* guideline includes the remaining two procedural requirements from *Waller*, that the trial court must consider reasonable alternatives and make sufficiently specific factual findings. The *Bone-Club* court noted this court's prior indication that "a trial court's weighing of the competing interests should include *entering specific findings*." *Id.* at 260 (emphasis added) (citing *Ishikawa*, 97 Wn.2d at 3[8]). Indeed, as amplified in *Ishikawa*, the fourth guideline requires the trial court to weigh the competing constitutional interests, consider the suggested alternatives to closure, and record the results of those deliberations "in its findings and conclusions, which should be as specific as possible rather than conclusory." *Ishikawa*, 97 Wn.2d at 38.

■ Before measuring the trial court's order in the present case against "the five-step closure test," we must determine whether the closure that was ordered in the present case is distinguishable in any meaningful way from the type of closure at issue in that case. *Bone-Club*, 128 Wn.2d at 261. The *Bone-Club* court defined the closure as a "temporary, full closure of [a] pretrial suppression hearing"—"temporary" because it was only for the testimony of one witness, "full" because all spectators were excluded. *Id.* at 257. Looking solely at the transcript of the trial court's ruling in the present case, the court ordered a permanent, full closure of voir dire: "I am ruling no family members, no spectators will be permitted into this courtroom during the selection of the jury because of the limitation of space,

security, etcetera [sic]. That's my ruling." VRP at 7. Because that ruling was announced *after* Orange's attorney and the prosecutor asked about access for family members as seats came available, the court appeared to reject the notion of revisiting the ruling. Even if the trial judge had intended to convey "that as the voir dire process continued, the issue of the parents in the courtroom could be reexplored," the mere possibility of later modifying the ruling did not alter the nature of the closing that the trial court had in fact ordered. Findings of Fact on Reference Hearing (FF) 3.

We also note that, were we to define the nature of the closure not by the presumptive effect of the plain language of the ruling itself but by additional facts about the closure educed at the posttrial evidentiary hearing, the closure in the present case was, at the very least, the same type of closure at issue in *Bone-Club*, a temporary, full closure. The findings from the reference hearing established that the effect of the trial court's closure ruling was a full closure of voir dire from the beginning of voir dire after the midmorning recess on Wednesday, April 26, 1995, through the following morning. For that period of time, which amounted to more than half of the total time spent on voir dire, no friends or family members, no reporters, and no other spectators were in the courtroom. In sum, by the plain language of its ruling, the court ordered a *permanent*, full closure of voir dire, and that ruling effected, at a minimum, a *temporary*, full closure, the precise type of closure to which the *Bone-Club* court applied the five, well-settled guidelines.

As a final point on the nature of the closure at issue here, we must recognize that the trial court's ruling unequivocally excluded the defendant's friends and family from the courtroom during voir dire. At the outset of the trial judge's colloquy with counsel, the trial judge acknowledged that the purpose was "to discuss the family members of the Oranges being here during the selection of the jury." VRP at 6. Orange's counsel asserted that the defendant's family had "a significant interest," and he suggested two possible

places in the courtroom where the family could be seated. *Id.* Concluding that *"the family . . . will have to sit outside,"* the trial court stated that it was "ruling *no family members . . . will be permitted into this courtroom during the selection of the jury." Id.* at 7 (emphasis added). By its plain language, the ruling thus imposed a permanent exclusion. Because the State's briefing repeatedly confirmed that the defendant's family members were excluded from voir dire for lack of courtroom space, the more particular inquiry in the posttrial evidentiary hearing was superfluous. *See* State's Resp. to Pers. Restraint Pet. at 19; Suppl. Br. of Resp't at 4; State's Answer to Br. of Amicus Curiae at 5. Nevertheless, those findings indisputably established that the defendant's family and friends were excluded for at least the first two days of voir dire (again, for more than half of the jury selection process); moreover, one finding specifically stated that, "[o]n either April 26th or April 27th, a family member and friend of the defendant [were] turned away from entering the courtroom by a[ ] uniformed guard." FF 17. Because Orange's parents "had a strong desire to sit through the entire trial," they and a friend occupied the benches outside the courtroom door, where "the entire jury panel could see [them] anytime [the prospective jurors] entered or left the courtroom." FF 14.

We turn now to a consideration of the *Bone-Club* guidelines, "the five criteria . . . *mandated* to protect a defendant's right to [a] public trial." 128 Wn.2d at 259 (emphasis added). Under the first guideline, the trial court, as the proponent of closure, was required to identify a compelling interest that the closure was essential to protect. Additionally, unless the purpose of the closure was the protection of Orange's right to a fair trial, the trial court was required to show a serious and imminent threat to that compelling interest. At the time of his ruling, the trial judge identified two reasons for ordering the closure: "because of the limitation of space, security, etcetera [sic]." VRP at 7. Inherent in the first reason, "the limitation of space," was the trial judge's interest in accommodating as a single

group the entire 98-member jury pool. The court did not explain why he was compelled to call 98 prospective jurors (as opposed to 90, for example, which would have allowed seating for some family members, other spectators, and the press) or why the venire could not have been divided. *See In re Closure of Jury Voir Dire*, 204 Mich. App. 592, 596, 516 N.W.2d 514 (1994) (holding closure of voir dire unconstitutional where court "gave no reason why every member of the jury pool had to be in the courtroom at one time").

The second reason for closure, "security," received no discussion at the time of the ruling. While the trial judge acknowledged the problem of "separat[ing] the family from the jurors," this observation, on its face, appeared to be related more to courtroom management and convenience than to any particular concerns for security. VRP at 6, 7. We recognize that the initial factual finding from the reference hearing commented generally on the security concerns: "The crimes the defendant was charged with were thought to be gang related. Because of this, there was great concern for the safety and security of participants in the courtroom during the trial. There was concern that the defendant himself could be the target for retaliation by persons associated with a gang." FF 1. However, consistent with our observation in *Bone-Club* that "determination of a compelling interest [is] the affirmative duty of the trial court, not the court of appeals," 128 Wn.2d at 261, we emphasize that it was the trial court's affirmative duty, not the duty of the superior court in a reference hearing more than eight years later, to identify the compelling interest justifying the encroachment on Orange's constitutional right to a public trial. The trial court did not fulfill that duty. Moreover, even if the trial court had made the observations contained in the first factual finding from the reference hearing, we could not conclude that the trial court had identified with sufficient particularity a serious and imminent threat to the safety of the defendant or any other trial participants.

Nor did the trial court comply with the third and fifth *Bone-Club* guidelines, which provide that a closure order

must be no broader in scope and duration than is necessary to protect the threatened interests. Even if we were to view as a compelling interest the trial court's desire to keep the large jury pool intact, the trial court's ruling was not narrowly tailored to preserve that aim. A reasonably tailored order would have, at a minimum, allowed seating for the defendant's family, as well as members of the press, and would have clearly and specifically provided that, as prospective jurors were excused from the crowded courtroom, additional spectators could be admitted to take the available seats or standing positions. *See Watters v. State*, 328 Md. 38, 45, 612 A.2d 1288 (1992) (holding that, even if "a legitimate interest in preventing overcrowding" could have been established, "the exclusion of all persons," including members of the petitioner's family and representatives of the press, was not a "narrowly tailored means of protecting that interest"). Indeed, in the present case, the trial judge's oral ruling was so broadly stated that the attorneys assumed that the judge had decided to close the courtroom for the duration of voir dire to all persons not in the jury pool. Similarly, we cannot conclude that the closure order was narrowly tailored to protect the trial participants from violence, since the trial court issued a blanket closure and identified no particularized, credible threat.

Of the procedural requirements, only the second *Bone-Club* guideline was met. The trial court satisfied the hearing requirement by giving those present an opportunity to respond to his proposed courtroom closure. The components of the fourth guideline were not satisfied. The trial court gave little more than passing consideration to alternatives to full closure, and although the court expressed some "understand[ing of the family members'] concerns," that acknowledgment was entirely inadequate to satisfy "the weighing procedure" mandated in *Bone-Club*. VRP at 6; 128 Wn.2d at 261. In the absence of a consideration of alternatives and a weighing of interests, the court, understandably, could not and did not "enter[ ] specific findings." *Id.* at 260. Plainly, the record in this case "lacks any hint the trial court

considered Defendant's public trial right, much less engaged in the detailed review required to protect that right." *Id.* at 260-61.

■ In light of the foregoing analysis, we adopt verbatim the holding in *Bone-Club*: "We hold the trial court's failure to follow the five-step closure test . . . violated Defendant's right to a public trial under section 22."[1] Echoing the conclusions of Maryland's highest court, we emphasize that, "[a]long with the general detriments associated with a closed trial, notably *the inability of the public to judge for itself and to reinforce by its presence the fairness of the process*, the present case demonstrates other kinds of harms: *the inability of the defendant's family to contribute their knowledge or insight to the jury selection* and *the inability of the venirepersons to see the interested individuals.*" *Watters*, 328 Md. at 48 (emphasis added). As a result of the unconstitutional courtroom closure in the present case, what the prospective jurors saw, as they entered and exited the courtroom during at least the first two days of voir dire, was not the participation of the defendant's family members in the jury selection process, but their conspicuous exclusion from it. The vigil of Orange's parents outside the closed courtroom doors may have been especially suggestive here, given that prospective jurors were questioned in chambers on their knowledge of the Orange family's reputation in the community.

Before we address the proper remedy for the infringement of Orange's public trial right, some misconceptions in the concurrence warrant attention. First, observing that, "[w]hen applying the five-part test . . . a court should not lose sight of the constitutional issue itself—whether a defendant's rights protected by the open court guaranty have been abridged," the concurrence misses the point that to apply the *Waller* and *Bone-Club* guidelines is, in fact, to

---

[1] 128 Wn.2d at 261. The preceding sentence in *Bone-Club* noted the absence of "a trial court record showing any consideration of Defendant's public trial right." *Id.* Notably, the *Bone-Club* court did not remand the matter to the superior court for the post hoc development of a more extensive record.

focus squarely on the protection of the public trial right. Concurrence at 822. Second, claiming that, prior to applying the constitutional guidelines, a reviewing court must determine "what actually occurred in response to the ruling," the concurrence imposes on a defendant seeking review of a closure order the threshold burden of establishing that the order was carried out. *Id.* at 823. The concurrence incorrectly claims that *State v. Gaines*, 144 Wash. 446, 258 P. 508 (1927), mandates this hurdle. But *Gaines* was decided more than 50 years before the United States Supreme Court decided *Press-Enterprise* and *Waller* and more than 60 years before this court applied the constitutional guidelines to assess defendant Bone-Club's claimed violation of his right to a public trial. In fact, the two questions that the *Gaines* court had to answer—was there a closure order[2] and, if so, was it followed?—would not have arisen had the trial court in *Gaines* had the prescience to follow the *Bone-Club* guidelines. The guidelines require not simply an order, but a narrowly tailored order issued following a hearing on the competing interests of those advocating and opposing closure, and the very existence of the mandated order creates a strong presumption that the order was carried out in accordance with its drafting. The inquiry in *Gaines* that the concurrence would now impose as a preliminary inquiry here, and presumably in all subsequent closure cases, was necessary there in the absence of the protective guidelines that have since evolved in the line of state and federal cases from *Kurtz* in 1980 to *Bone-Club* in 1995. By excusing a trial court's disregard for

---

[2] At the midpoint of a three-week trial, the judge made the following "improvident statement" just prior to the evening adjournment: " 'Before adjourning I will state that the atmosphere is pretty unbearable. I know the jury must also feel it. . . . [W]ith those exceptions, court officers and members of the bar, the general public will be excluded, beginning tomorrow.' " 144 Wash. at 462. The *Gaines* court expressed doubt as to whether the trial court's order could even "be called an order" and suggested that there could be no presumption that the order had been carried out, since the trial judge entered no formal order, the clerk's minutes made no mention of the order, and the record contained no direction to a particular officer to enforce the order. *Id.* at 463. In contrast, Orange was entitled to the presumption that the order had been carried out, given that the trial judge plainly referred to the order as his "ruling," the clerk's minute entry recorded the ruling, and attorneys for the defense and prosecution enforced it.

the well-settled guidelines, the concurrence's approach not only invites the waste of court resources on posttrial evidentiary hearings but results in unnecessary delays in appellate review.

■ As to the remedy for the violation of Orange's public trial right, we granted the defendant in *Bone-Club* a new trial, stating that "[p]rejudice is presumed where a violation of the public trial right occurs." 128 Wn.2d at 261-62 (citing *State v. Marsh*, 126 Wash. 142, 146-47, 217 P. 705 (1923); *Waller*, 467 U.S. at 49 & n.9). Thus, had Orange's appellate counsel raised the constitutional violation on appeal, the remedy for the presumptively prejudicial error would have been, as in *Bone-Club*, remand for a new trial. Consequently, we agree with Orange that the failure of his appellate counsel to raise the issue on appeal was both deficient and prejudicial and therefore constituted ineffective assistance of counsel. *See State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (citing *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987) (applying the two-prong test in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984))). The failure to raise the courtroom closure issue was not the product of "strategic" or "tactical" thinking, and it deprived Orange of the opportunity to have the constitutional error deemed per se prejudicial on direct appeal. 127 Wn.2d at 336. The remedy for counsel's failure to raise on appeal the violation of Orange's public trial right is remand for a new trial.

*First Degree Attempted Murder and First Degree Assault of Walker: Double Jeopardy.* Orange was charged with attempted first degree murder of Walker and first degree assault of Walker. The State alleged in count two of the information that Orange committed the crime of first degree attempted murder, pursuant to RCW 9A.32.030(1)(a) and 9A.28.020, when he "act[ed] with premeditated intent to cause the death of another person and did attempt to cause the death of Marcel Walker." Opening Br. of Pet'r, App. A (Second Am. Information) at 1-2. Count three

alleged that, pursuant to RCW 9A.36.011(1)(a), Orange committed an assault in the first degree when he, *"at the same time as the crime charged in count 2*, then and there, with intent to inflict great bodily harm upon another person, did intentionally assault Marcel Walker with a firearm." Opening Br. of Pet'r, App. A (Second Am. Information) at 2 (emphasis added). Count three alleged in particular that, for purposes of RCW 9.94A.120(4), *recodified as* RCW 9.94A.505, Laws of 2001, ch. 10, § 6, Orange "used such force or means likely to result in death to or intended to kill Marcel Walker." *Id.* Orange thus contends that, because the two crimes were "based on the same shot in the same incident," the convictions on counts two and three violated double jeopardy. Opening Br. of Pet'r at 44.

The Washington State Constitution, article I, section 9 provides the same protection against double jeopardy as the fifth amendment to the federal constitution.[3] The state and federal double jeopardy clauses protect against multiple punishments for the same offense, as well as against a subsequent prosecution for the same offense after acquittal or conviction. *State v. Gocken*, 127 Wn.2d 95, 100, 896 P.2d 1267 (1995) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989)). Where a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense. *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995) (citing *Whalen v. United States*, 445 U.S. 684, 688, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980)); *Brown v. Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977) (observing that "role of the

---

[3] *State v. Gocken*, 127 Wn.2d 95, 107, 896 P.2d 1267 (1995). *Compare* WASH. CONST. art. I, § 9 ("No person shall be compelled in any criminal case to . . . be twice put in jeopardy for the same offense."), *with* U.S. CONST. amend. V ("nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb"). "The Fifth Amendment applies to the states through the Fourteenth Amendment." *Gocken*, 127 Wn.2d at 100 (citing *Benton v. Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969)).

constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense"). Where, as here, the relevant statutes do not expressly disclose legislative intent, Washington courts apply a rule of statutory construction that has been variously termed the "same elements" test, the "same evidence" test, and the *Blockburger* test.[4]

Washington courts first applied the "same elements" test in *State v. Reiff*, 14 Wash. 664, 45 P. 318 (1896). There, the court held that successive prosecutions for larceny by means of false impersonation and for obtaining goods under false pretenses did not constitute double jeopardy:

> There are elements requisite to each which are not necessary to the other, and proof of the offense charged in either of the informations would not be sufficient to sustain a conviction under the other. To sustain the plea, the offenses must be identical both in fact and in law.
>
> "A conviction or acquittal upon one indictment is no bar to a subsequent conviction and sentence upon another, *unless the evidence required to support a conviction upon one of them would have been sufficient to warrant a conviction upon the other*."

*Id.* at 667 (emphasis added) (quoting *Morey v. Commonwealth*, 108 Mass. 433, 434 (1871)). The *Reiff* court's "same elements" test is indistinguishable from the *Blockburger* test, which the United States Supreme Court and this court have endorsed.[5] In *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), the Court concluded

---

[4] *See Calle* 125 Wn.2d at 777; *State v. Roybal*, 82 Wn.2d 577, 580-81, 512 P.2d 718 (1973); *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

[5] *United States v. Dixon*, 509 U.S. 688, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993) (reestablishing the *Blockburger* test and overruling the "same conduct" test embraced three years prior in *Grady v. Corbin*, 495 U.S. 508, 110 S. Ct. 2084, 109 L. Ed. 2d 548 (1990)); *see Gocken*, 127 Wn.2d at 102, 104 (terming the *Blockburger* test "the exclusive standard for reviewing" double jeopardy challenges and observing that the *Reiff* test "is basically identical to the *Blockburger* test").

that the two charged crimes arising from a single narcotics sale were distinct offenses:

> Each of the offenses created requires proof of a different element. The applicable rule is that where *the same act or transaction* constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision *requires proof of a fact* which the other does not. *Gavieres v. United States*, 220 U.S. 338, 342, [31 S. Ct. 421, 55 L. Ed. 489 (1911),] and authorities cited. In that case this court quoted from and adopted the language of the Supreme Court of Massachusetts in *Morey v. Commonwealth*, 108 Mass. 433: "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other."

*Id.* at 304 (emphasis added). Thus, the *Blockburger* Court, likewise relying on *Morey*, repeated the *Reiff* court's assertion that two charged crimes will not constitute the same offense if each requires proof of a fact not required by the other.

The Court of Appeals has previously applied the *Blockburger* test to the two crimes at issue here, attempted murder and assault. *See State v. Valentine*, 108 Wn. App. 24, 29 P.3d 42 (2001) (declining to review sufficiency of evidence supporting trial court's finding of deliberate cruelty), *review denied*, 145 Wn.2d 1022 (2002). Whereas the present case presents the question of whether punishing a single shot as an attempted murder and an assault violates double jeopardy, the *Valentine* court was asked to determine whether "[i]t is a double jeopardy violation to punish a stabbing separately as an assault when it is also the substantial step used to prove attempted murder." *Id.* at 26. Although the *Valentine* decision arrived at the correct conclusion—that prosecution for attempted murder and assault based on the same act violates double jeopardy—it did so despite misapplying the "same elements" or *Blockburger* test. Purporting to apply the test, the Court of

Appeals did nothing more than compare the statutory elements at their most abstract level:

> By the "same evidence" test, the offenses charged are not the same. Attempted murder necessarily includes the element of intent to kill, but assault does not. First degree assault necessarily contains the element of assault, but attempted murder does not; the substantial step necessary to prove attempted murder may be something other than an assault.

*Valentine* at 27 (footnote omitted). Because the criminal attempt statute includes the element of "do[ing] any act which is a *substantial step* toward the commission of the crime," the Court of Appeals concluded that attempted murder requires an element lacking in assault. RCW 9A.28.020(1) (emphasis added). The court reasoned that, since murder could be attempted by all sorts of "substantial steps" other than assault (e.g., by lying in wait or constructing a bomb), attempted murder does not necessarily include assault.

The *Valentine* court's reluctance to look at the facts used to prove the statutory elements exposes a misconception about the *Blockburger* test. That the test has been alternatively called the "same elements" and the "same evidence" test underscores that the *Blockburger* test requires the court to determine "whether each provision *requires proof of a fact which the other does not*." 284 U.S. at 304 (emphasis added); *see Whalen*, 445 U.S. at 693-94. Unless the abstract term "substantial step" is given a factual definition, there is simply no way to assess whether attempted murder requires proof of a *fact* not required in proving the assault. The *Valentine* court's belief that the "substantial step" element had to remain a generic term for purposes of the "same elements" test ignores the reality that the term "substantial step" is a placeholder in the attempt statute, having no meaning with respect to any particular crime and acquiring meaning only from the facts of each case. *See Harris v. Oklahoma*, 433 U.S. 682, 97 S. Ct. 2912, 53 L. Ed. 2d 1054 (1977) (holding double jeopardy violated by convictions for felony murder and underlying crime); *United States v. Dixon*, 509 U.S. 688, 717, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993) (observing that, in *Harris*, Court did not

"depart[ ] from *Blockburger*'s focus on the *statutory* elements of the offenses charged" when it "construed th[e] generic reference to some felony as incorporating the statutory elements of the various felonies upon which a felony-murder conviction could rest").

The belief that the "same elements" test requires a court to compare a generic element in one offense to a specific element in a second offense led the *Valentine* court to find another basis for defining the two offenses as the same for double jeopardy purposes. The court sought and found elsewhere "clear evidence that the Legislature intended to impose only a single punishment." 108 Wn. App. at 28. The *Valentine* court turned to two prior Court of Appeals decisions. In *State v. Read*, 100 Wn. App. 776, 998 P.2d 897 (2000), *aff'd*, 147 Wn.2d 238, 53 P.3d 26 (2002), the Court of Appeals concluded that, under the *Blockburger* test, convictions for second degree intentional murder and first degree assault violated double jeopardy: "There is no question that Mr. Read's murder and assault convictions are the same *in fact*, because they are based on the same act, directed at the same victim. . . . Under the 'same evidence' test, the offenses are the same *in law*. . . . [P]roof of second degree intentional murder necessarily also proves first degree assault." *Id.* at 791-92. Applying *Read*, the *Valentine* court concluded that the legislature could not have intended "that a stabbing should result in only one conviction if the victim dies [the circumstance in *Read*], but should result in two convictions [i.e., for *attempted* murder and assault] if the victim survives." 108 Wn. App. at 28.

The *Valentine* court also recalled *State v. Potter*, 31 Wn. App. 883, 645 P.2d 60 (1982), another case in which a court's general application of the "same elements" test had led to unsatisfactory results. In *Potter*, the defendant was found guilty of (and given consecutive sentences for) reckless driving and reckless endangerment. Although the *Potter* court did not set forth the statutory elements of the two offenses, it "note[d] that reckless endangerment has *a general conduct element* while reckless driving can arise

only out of the operation of a vehicle." *Id.* at 887-88 (emphasis added). Just as the *Valentine* court concluded that "proof of attempted murder committed by assault will always establish an assault," 108 Wn. App. at 29, the *Potter* court had "observe[d] that proof of reckless endangerment through use of an automobile will *always* establish reckless driving." 31 Wn. App. at 888. In concluding that the offenses were the same and therefore violated double jeopardy, the *Potter* court believed that it was being forced to abandon the long-standing *Blockburger* test, which it consequently declared unfit for determining legislative intent. But again, the *Valentine* and *Potter* courts could have found a double jeopardy violation by applying the "same elements" test, for double jeopardy will be violated where " '*the evidence required* to support a conviction upon one of [the charged crimes] would have been sufficient to warrant a conviction upon the other.' " *Reiff*, 14 Wash. at 667 (emphasis added) (quoting *Morey*, 108 Mass. at 434).

 Consistent with the result in *Valentine* but applying a more direct application of the *Blockburger* test, we reverse the Court of Appeals and hold that Orange's convictions for first degree attempted murder and first degree assault violated his constitutional protection against double jeopardy. *See also In re Pers. Restraint of Burchfield*, 111 Wn. App. 892, 46 P.3d 840 (2002) (holding that convictions for first degree manslaughter and first degree assault arising out of same gunshot violated double jeopardy). Under the *Blockburger* test, the crimes of first degree attempted murder (by taking the "substantial step" of shooting at Walker) and first degree assault (committed with a firearm) were the same in fact and in law. The two crimes were based on the same shot directed at the same victim, and the evidence required to support the conviction for first degree attempted murder was sufficient to convict Orange of first degree assault.

 *First Degree Murder of McClure and First Degree Attempted Murder of Walker: Double Jeopardy and Consecutive Sentences.* As discussed above, the crime of first

degree attempted murder of Walker (count two) was based on the same bullet giving rise to the charge of first degree assault of Walker (count three). While the information stated that the first degree assault occurred "at the same time as" the crime of first degree attempted murder, it did *not* allege that the crime of first degree attempted murder (count two) occurred "at the same time as" the crime of first degree murder (count one). We therefore agree that the firing of the bullet that struck McClure was "factually attenuated from the subsequent assault occurring when Mr. Orange re-aimed his gun to shoot the fleeing Mr. Walker." *Orange*, 2002 WL 508351, at *6, 2002 Wash. App. LEXIS 1667. Because the two charged crimes were not the same in fact, the convictions do not violate double jeopardy.

 Under former RCW 9.94A.400(1)(b) (1990), "[w]henever a person is convicted of two or more serious violent offenses . . . arising from separate and distinct criminal conduct," the sentences "shall be served consecutively to each other." Offenses arise from separate and distinct conduct when they involve separate victims. *State v. Wilson*, 125 Wn.2d 212, 220, 883 P.2d 320 (1994); *State v. Vike*, 125 Wn.2d 407, 410, 885 P.2d 824 (1994). Because the offenses in counts one and two involved different victims, McClure and Walker, the court properly ordered Orange to serve the sentences consecutively.

## CONCLUSION

In a line of cases reaching back two decades, we have developed plainly articulated guidelines that every trial court must follow when faced with a courtroom closure request. *See Kurtz*, 94 Wn.2d 51; *Ishikawa*, 97 Wn.2d 30; *Eikenberry*, 121 Wn.2d 205; *Bone-Club*, 128 Wn.2d 254. Under the *Bone-Club* guidelines, which safeguard a defendant's article I, section 22 right to a public trial and comply with the Sixth Amendment standard set forth in *Waller*, 467 U.S. 39, the proponent of closure must articulate a compelling interest to be served by the closure, and the trial

court must hold a hearing, weigh alternatives to the proposed closure, narrowly tailor the closure order to protect the identified threatened interest, and enter findings that specifically support the order. *Bone-Club*, 128 Wn.2d. at 258-60. Our unanimous decisions in *Bone-Club*, *Eikenberry*, and *Ishikawa* prescribed and applied the constitutional requirements for closure so clearly and emphatically that approving the trial court's actions in this case would undermine 20 years of consistency on this legal issue. We therefore grant Orange's personal restraint petition and remand for a new trial.

Additionally, for purposes of guidance on retrial, we address Orange's two double jeopardy challenges. First, because we conclude that Orange's convictions for first degree attempted murder and first degree assault of Walker violated the constitutional prohibition against double jeopardy, on retrial judgment may be entered on only one of the two counts. Second, regarding Orange's convictions for first degree murder of McClure and first degree attempted murder of Walker, we conclude that double jeopardy was not violated and that the imposition of consecutive sentences for those crimes was proper.

ALEXANDER, C.J.; JOHNSON, SANDERS, and CHAMBERS, JJ.; and SMITH, J. Pro Tem., concur.

MADSEN, J. (concurring in majority) — While I concur in the majority opinion, I write separately because the majority unjustifiably limits appellate review of whether a defendant's constitutional right to a public trial has been violated, placing form over substance. When applying the five-part test from *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995), a court should not lose sight of the constitutional issue itself—whether a defendant's rights protected by the open court guaranty have been abridged. The analysis of this issue must begin with asking whether closure in fact occurred. The majority examines the transcript of the trial court's ruling to resolve this question,

adding only in dicta that even if it considered the effect of the ruling it would reach the same result. Majority at 808. However, a court must determine whether a closure order has been implemented and whether an unconstitutional closure has actually occurred. If a closure order is not carried out, there is in fact no violation of the defendant's right to an open trial.

I also write to emphasize that a trial court may order closure for a number of legitimate reasons and must be accorded discretion to do so.

## ANALYSIS

The majority concludes that closure occurred here based upon the transcript of the trial court's oral ruling closing the courtroom. Majority at 807-08. The majority then adds in dicta that even if the closure was not measured by the ruling itself, but instead by the actual effect of the judge's ruling, the result would be the same. Majority at 808.

However, it has been the law in this state since at least 1927 that in order to determine whether a trial closure violates the constitutional standard applicable to the open trial guaranty, a reviewing court must consider not only the language of the closure ruling; it must also look at what actually occurred in response to the ruling. In *State v. Gaines*, 144 Wash. 446, 462, 258 P. 508 (1927), the trial judge made the following statement before adjournment for the evening:

> "Before adjourning I will state that the atmosphere is pretty unbearable. I know the jury must also feel it. I assume there is a certain part of the members of the bar, who from the standpoint of students, desire to hear the testimony, but with those exceptions, court officers and members of the bar, the general public will be excluded, beginning tomorrow."

*Gaines*, 144 Wash. at 462. The judge said that " 'the general public will be excluded beginning tomorrow.' " *Gaines*, 144 Wash. at 462. But this court observed that, despite the trial court's order, "on the day following the

making of the statement, there was some attempt to carry it out, but . . . after that, the public were admitted to the court room to the extent at least of the seating capacity therein reserved for that purpose." *Id.* at 462. This court held that "[i]f the attendance was limited to the reasonable capacity of the court room, without partiality or favoritism, we do not understand that there is any claim that this would have constituted error." *Id.* at 463.

The critical inquiry is whether the effect of the court's order was to "unwarrantedly abridge" the interests protected by the open court guaranty. *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 511 n.10, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581 n.18, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980)).[6] Thus, a reviewing court's analysis of the actual effect of a closure order is not, as the majority's analysis suggests, merely an optional analysis (that may or may not be expressed in dicta). It is, instead, an integral part of the analysis necessary to determine whether there has been an infringement of the defendant's interest protected by the open trial guaranty of the Sixth Amendment and article I, section 22 of the Washington State Constitution. If there is no closure in fact, there is no abridgement of the defendant's right to an open trial.

Moreover, if the effect of even an unjustified closure is de minimis in fact, there is also no infringement of the defendant's constitutional rights. *See Peterson v. Williams*, 85 F.3d 39 (2d Cir. 1996) (brief, inadvertent continuation of proper closure too trivial to violate Sixth Amendment); *Snyder v. Coiner*, 510 F.2d 224, 230 (4th Cir. 1975) (bailiff's refusal to allow persons to enter or leave the courtroom for a time during closing arguments too trivial to amount to a constitutional violation); *United States v. Ivester*, 316 F.3d 955, 959-60 (9th Cir. 2003) (exclusion of public during

---

[6] In *Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984), the Court held that under the Sixth Amendment, the closure of a suppression hearing, over the objections of the accused, must meet the test applicable under the First Amendment as set out in *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984).

midtrial questioning of jurors about safety concerns was so trivial as not to implicate Sixth Amendment right to a public trial); *United States v. Al-Smadi*, 15 F.3d 153 (10th Cir. 1994) (brief, inadvertent closing of courthouse during trial did not violate the Sixth Amendment right to a public trial).

Thus, the majority adapts a flawed analysis when it holds that determining whether a closure has occurred is based on the face of the order or oral ruling.

Next, it is essential to bear in mind that a trial judge must exercise judgment in deciding whether to order closure of the courtroom. The United States Supreme Court and this court have acknowledged that the right to a public trial is not absolute. *Waller v. Georgia*, 467 U.S. 39, 45, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984); *Bone-Club*, 128 Wn.2d at 259. A trial judge may " 'in the interest of the fair administration of justice, impose reasonable limitations on access to a trial.' " *Press-Enterprise*, 464 U.S. at 511 n.10 (quoting *Richmond Newspapers*, 448 U.S. at 581 n.18). Thus, courts have found closure justified in order to protect a defendant's right to a fair trial, to protect privacy rights of jurors, informants, and witnesses, to protect the privacy interests of juvenile defendants, and to protect ongoing government investigations. *See generally* 32 ANNUAL REVIEW OF CRIMINAL PROCEDURE, *Sixth Amendment at Trial* 584, 587 (GEO. L.J. 2003) (and cases cited therein). The Court has also recognized that "since courtrooms have limited capacity, there may be occasions when not every person who wishes to attend can be accommodated." *Richmond Newspapers*, 448 U.S. at 581 n.18. Thus, overcrowding may be a legitimate reason for closing a courtroom to additional spectators who have no immediate concern with the trial. *United States v. Yeager*, 448 F.2d 74, 80 (3d Cir. 1971); *United States v. Kobli*, 172 F.2d 919, 922 (3d Cir. 1949); *People v. Woodward*, 4 Cal. 4th 376, 841 P.2d 954, 14 Cal. Rptr. 2d 434, 435 (1992). However, courts have held that there is a special concern for ensuring that a defendant's family be permitted to attend. *In re Oliver*, 333 U.S. 257,

271-72, 68 S. Ct. 499, 92 L. Ed. 682 (1948); *English v. Artuz*, 164 F.3d 105, 108 (2d Cir. 1998); *State v. Torres*, 844 A.2d 155, 159 (R.I. 2004). Thus, while overcrowding is a legitimate basis for closing a courtroom to further spectators, it does not outweigh the defendant's interest in having his or her family present where, as the majority notes, alternative arrangements can be made so that family members may attend. *E.g., Torres*, 844 A.2d 155.

Finally, two other aspects of the majority opinion concern me. First, the majority says that it is the trial court's affirmative duty, not that of a court in a reference hearing, to identify a compelling interest justifying closure. Majority at 810. Certainly under *Bone-Club* it is the trial court's duty to make this determination. But the failure to fulfill that duty does not mean that a defendant's right to an open trial has been infringed. The majority, however, treats its consideration of the reference court's findings as dicta, majority at 810, and thus its true holding is that unless the trial court itself makes the proper, sufficiently specific findings, its closure order cannot be sustained. Given that the result of this approach could well be a burdensome retrial where there was no actual violation of the right to an open trial, the approach makes little sense. Moreover, some courts have reasoned, contrary to the majority's implicit disapproval of findings upon later consideration, that remand for entry of the required findings is the appropriate course where insufficient findings were made. *E.g., United States v. Doe*, 63 F.3d 121, 131 (2d Cir. 1995); *United States v. Galloway*, 937 F.2d 542, 547 (10th Cir. 1991), *vacated en banc on other grounds*, 56 F.3d 1239 (10th Cir. 1995). I fail to see why this cannot be achieved in a reference hearing, particularly when the issue is first raised in a personal restraint petition as is the case here.

Lastly, the majority states: " 'We hold[, as we did in *Bone-Club*, that] the trial court's failure to follow the five-step closure test . . . violated Defendant's right to a public trial under section 22.' " Majority at 812 (quoting *Bone-Club*, 128 Wn.2d at 261). This is a misstatement of the

holding in *Bone-Club* and an improper holding in this case. What the court actually said in *Bone-Club* was: "*Lacking a trial court record* showing any consideration of Defendant's public trial right, *we cannot determine whether closure was warranted*. We hold the trial court's failure to follow the five-step closure test . . . violated the Defendant's right to a public trial under section 22." *Bone-Club* 128 Wn.2d at 261 (emphasis added). Thus, it was the absence of a record from which the reviewing court could determine whether the public trial right was violated that led to the stated holding in *Bone-Club*. It must be remembered that the ultimate question is whether there has been an abridgement of the defendant's right to an open trial. If a reviewing court can make the determination from the record that closure was warranted, the failure to engage in the five-step process, *in and of itself*, should not lead to a holding that a defendant's right to a public trial has, solely because of that failure, been abridged. I do not suggest, however, that the *Bone-Club* test be ignored, nor that this court depart from the presumption of openness.[7] But it places form over substance to hold that a trial court's failure to apply *Bone-Club* automatically requires a retrial.

With the qualifications stated in this opinion, I concur in the majority's decision.

BRIDGE, J., concurs with MADSEN, J.

IRELAND, J. (dissenting) — I agree with the concurrence by Justice Madsen that the court may close a courtroom in order to protect a defendant's right to a fair trial. As the concurrence points out, overcrowding may be a legitimate reason for closing a courtroom. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581 n.18, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980). In fact, it is in the interest of the defendant to have a jury venire untainted by the distrac-

---

[7] In *Press-Enterprise*, the Supreme Court held that "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise*, 464 U.S. at 510.

tions of warring family members and spectators mingling among them. Much of the jury inquiry during the claimed court closure was conducted in chambers. Allowing the jury venire to occupy all of the available seating in this case, to the exclusion of spectators, even family, was not an abuse of discretion. No member of the press claimed actual exclusion. The reference hearing showed the effect of the claimed closure was de minimis. Although the trial court should follow the five-step closure test of *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995), I reject the notion that failure to do so is subject to automatic reversal. I would remand the case for resentencing after dismissal of one of two charges of attempted murder of Marcel Walker and first degree assault of Walker, which the majority properly finds violates double jeopardy. Otherwise, I would affirm the verdict of the court in all respects. Therefore, I dissent.

After modification, further reconsideration denied January 20, 2005.