**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
SEPTEMBER 11, 2025

*Stgnc, C. J.*
CHIEF JUSTICE

**IN THE SUPREME COURT OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 103509-8 |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| OWEN GALE RAY, | ) | |
| | ) | Filed: <u>September 11, 2025</u> |
| Petitioner. | ) | |
| _____ | ) | |

YU, J. — Owen Gale Ray was convicted of second degree assault with a deadly weapon and felony harassment (threat to kill) for threatening his wife with a gun. He argues his convictions violate the constitutional prohibition on double jeopardy by imposing multiple punishments for "the same offense." WASH. CONST. art. I, § 9; *see also* U.S. CONST. amend. V.

Ray's assault and harassment convictions are the same in *fact* because they are both based on the same conduct. However, "to qualify as the 'same offense' for double jeopardy purposes," they must also be the same in *law*. *State v. Arndt*, 194 Wn.2d 784, 815, 453 P.3d 696 (2019). As charged and proved in this case,

second degree assault and felony harassment are not the same in law because "'each provision requires proof of a fact which the other does not.'" *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 817, 100 P.3d 291 (2004) (emphasis omitted) (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)). Specifically, the assault conviction required proof of a *higher mens rea* (intentional v. knowing), and the harassment conviction required proof of a *more serious threat* (threat to kill v. threat to cause bodily injury).

Thus, neither conviction necessarily proved the other. Moreover, there is no clear evidence the legislature intended to prohibit separate punishments for second degree assault and felony harassment arising from a single act. As a result, they are not the "same offense" for double jeopardy purposes. We affirm.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts are derived from the evidence at trial, primarily the testimony of Ray and his wife, Kristin.[1] As the trial court observed, "*what* happened was really not that much in dispute." 14 Verbatim Rep. of Proc. (VRP) (Oct. 28, 2022) at 1553 (emphasis added). Instead, the dispute "was more about *why*" it happened, "and what was in people's heads" at the time. *Id.* (emphasis added).

---

[1] To avoid confusion, Kristin Ray is referred to in this opinion by her first name; no disrespect is intended.

A.   Ray threatened his wife with a gun in front of their children before he ultimately surrendered to law enforcement

At the time of the offenses, Ray and Kristin had been married for over 20 years. Kristin testified they had had a good marriage for most of that time. However, by late 2020, both spouses felt the marriage was deteriorating. Kristin believed the primary cause was Ray's increased alcohol use in recent years. Ray primarily attributed their marital difficulties to the demands of his military career.

The effect of Ray's military career on his mental state was addressed in detail at trial. Ray was commissioned to second lieutenant in the United States Army as a combat engineer officer when he graduated from college. Over the course of his career, Ray served in numerous combat deployments and was selected for various sensitive, high-level positions. Ray's service exposed him to significant trauma and stress, which caused him to develop "suicidal ideation" that "got worse" over time. 10 VRP (Sept. 21, 2022) at 1338, 1346. However, Ray concealed his symptoms from his military command and did not seek mental health treatment because, as he explained at trial, he did not want to admit to "weakness" or an inability to do his job. *Id.* at 1340.

On the night of the offenses, Ray was serving as chief of staff for Joint Base Lewis-McChord, where he and Kristin lived in a three-story house with their three children, then ages 7, 9, and 16. At about 8 p.m., the family started watching a movie in the ground-floor living room. By that time, Ray had started drinking

alcohol. Around 9 p.m., the oldest child asked for help driving to work the next day. Ray volunteered, but the child asked if Kristin would do it. In response, Ray "got very angry . . . and started yelling and cussing" that Kristin was "undermining him." 5 VRP (Sept. 13, 2022) at 481. The children went upstairs to get ready for bed, but Ray continued yelling at Kristin and accusing her of "ruining his credibility." *Id.* at 482. Kristin testified the yelling continued for about 30 minutes before she followed the children upstairs to help them get ready for bed.

All the children were sleeping on the third floor of the house that night. Kristin said good night to them, then took a shower on the second floor. While Kristin was upstairs, Ray went to the garage to prepare his guns for the shooting range and contemplated suicide. Ray testified that he "just wanted to be left alone" in the garage, but he also sent Kristin a text message during this time frame that read: "For the record - the whole can you drive her to work BS was in front of our daughter. Way to destroy the father's credibility as always. Done with this shit." 10 VRP (Sept. 21, 2022) at 1349; Ex. 82.

After her shower, Kristin went back down to the ground floor to take care of the family dog. She could hear Ray yelling at the television, so she closed a door to prevent the noise from going upstairs. Kristin testified that closing the door seemed to anger Ray, who came out and started yelling at her again. By contrast, Ray testified that Kristin interrupted him because she wanted to continue arguing.

4

Kristin told Ray to back off, then went back upstairs. She initially went to her bedroom on the second floor, but Ray was still getting louder downstairs, "saying things like, 'You want to do this?' 'Let's do this.' 'Fine, I don't care.'" 5 VRP (Sept. 13, 2022) at 486. Kristin believed that Ray was planning to come upstairs to resume their argument. In an effort to prevent this, she went up to the third floor, where the children's bedrooms were, because Ray typically would not argue with her in front of the children. However, on this occasion, Ray followed Kristin upstairs.

Ray testified that he "[v]aguely" remembered going upstairs "in an attempt to try to tell [Kristin] not to call 9-1-1." 10 VRP (Sept. 21, 2022) at 1350. From the third floor, Kristin could see as Ray reached the second floor and "started throwing open doors and turning on lights" in a "very aggressive" manner. 5 VRP (Sept. 13, 2022) at 487-88. Kristin became concerned and dialed 911 on her phone, but she did not hit send right away. At the time, Kristin did not realize Ray had brought a gun upstairs with him.

After Ray finished looking around the second floor, he proceeded up to the third floor, and Kristin saw that he had a gun. Kristin testified that Ray advanced on her and started yelling, and Kristin told Ray to put the gun away or she would call 911. Ray said, "'Go ahead. Call 9-1-1.'" *Id.* at 491-92. Kristin placed the

5

call as she backed away from Ray and into a bedroom where the two younger children were sleeping.

Kristin testified that when she began speaking with the 911 operator, Ray stepped into the children's bedroom after her, pointed his gun at Kristin, and yelled at her to hang up the phone. Ray testified that when he heard Kristin talking to the operator it "destroyed" him and that he could remember only "fragments and shards" from that point on. 10 VRP (Sept. 21, 2022) at 1351. However, Ray denied ever pointing the gun directly at Kristin, and he argued in closing that there was no proof he made any verbal threats to kill her.

Kristin testified that the situation "escalated very quickly" after she started speaking to the 911 operator. 5 VRP (Sept. 13, 2022) at 493. She fell to the floor, the children screamed, and Ray aimed the gun at Kristin while "kicking [her] in the chest and the stomach and ribs." *Id.* Kristin crawled into a narrow space between the bed and the wall to ensure that if Ray decided to shoot her, the children would not see. Ray followed, keeping the gun pointed at Kristin while he kicked her in the face and the children screamed at Ray not to kill their mother.

Ray left and reentered the children's bedroom twice during the 20-minute incident.[2] The first time he left, he immediately came back and continued yelling

---

[2] Kristin's first 911 call was placed at 12:12 a.m. Ex. 84. She and the two younger children escaped from the house 21 minutes later, at 12:33 a.m., followed shortly thereafter by the oldest child. 4 VRP (Sept. 12, 2022) at 177; 8 VRP (Sept. 19, 2022) at 1024.

and pointing the gun at Kristin. The second time Ray left the room, Kristin got up from the space between the bed and the wall, closed the door, and tried to block the doorway with a bookcase. However, Ray kicked the door open, breaking the bookcase and knocking Kristin back down to the floor.

Kristin testified that after Ray kicked open the door, he pointed the gun at the children, who were on the bed. Kristin jumped in front of the children to protect them, and Ray kept the gun pointed at her for a moment before turning to kick apart the bookcase she had used to block the door. Then, Ray turned the lights off and pointed the gun at Kristin and the children again. At that point, Kristin thought he was going to shoot them all, and she resolved to escape.

Ray eventually turned around and started yelling about the law enforcement officers who had started to arrive. Kristin tried to grab the children and run, but Ray turned around and blocked the door again. Kristin yelled at Ray to let the children go, and he eventually took a step back. Kristin pushed the two younger children through the door and screamed for the oldest child to follow. As they fled, Ray raised the gun at Kristin and kept it raised, but he did not fire.

Kristin and the two younger children ran outside at 12:33 a.m., quickly followed by the oldest child. Officers drove them to a location about a block away, where Kristin and the oldest child answered police questions and took care of the younger children until it was safe to return.

Back at the house, Ray's standoff with law enforcement lasted nearly two hours. On several occasions, Ray walked out onto a balcony and pressed a gun to his head before going back inside. On one occasion, he yelled "something to the effect of 'Kristin, look what you did.'" 4 VRP (Sept. 12, 2022) at 287. Ray also sent Kristin a text message during this time frame that read: "Thanks for this. Best wife ever." Ex. 82.

Ray finally surrendered to law enforcement at 2:22 a.m. He was subsequently discharged from the military and diagnosed with service-related posttraumatic stress disorder, traumatic brain injury, and physical disabilities.

B. Following a jury trial, Ray's convictions were affirmed on appeal

The State charged Ray with seven crimes against Kristin, the children, and law enforcement. Relevant to the double jeopardy issue on review, the State explained in opening statements that the charges included (1) one count of second degree assault with a deadly weapon "for pointing the firearm at Kristin," (2) one count of second degree assault causing substantial bodily harm "for the injuries that [Ray] caused while he was kicking [Kristin]," and (3) one count of felony "harassment for the threats to kill [Kristin]."[3] 4 VRP (Sept. 12, 2022) at 160; *see* RCW 9A.36.021(1)(c), (a); RCW 9A.46.020(1)(a)(i), (2)(b)(ii).

---

[3] The State also charged Ray with kidnapping Kristin, reckless endangerment of the children, and felony harassment of law enforcement. He was found guilty of reckless endangerment and not guilty of the other charges. These charges are not at issue on review.

Following the State's case in chief, Ray moved to dismiss the second degree assault charge based on the injuries he caused by kicking Kristin. Ray did not deny kicking and injuring Kristin, but he argued the evidence was insufficient to prove substantial bodily harm. The trial court granted Ray's motion and dismissed that charge. The remaining charges were decided by a jury.

To convict Ray of second degree assault, the jury was instructed that it must find Ray "intentionally assault[ed]" Kristin "with a deadly weapon" by committing an "act" that was intended to, and did, make Kristin feel "reasonable apprehension and imminent fear of bodily injury." Clerk's Papers (CP) at 392-93, 407. To convict Ray of felony harassment, the jury was instructed that it must find Ray "knowingly threatened to kill" Kristin by "directly or indirectly" communicating his intent to kill her, using "words or conduct" that placed Kristin "in reasonable fear that the threat to kill would be carried out." *Id*. at 408, 399. The jury was also instructed on Ray's affirmative defenses of voluntary intoxication and diminished capacity.

In closing arguments, the State explained that the charge of second degree assault with a deadly weapon was based on Ray's actions in "yelling and screaming and pointing the gun." 11 VRP (Sept. 22, 2022) at 1446. The State did not single out any *specific* act as *the* assault; instead, it described the entire 20-minute incident as one continuous assault. The State also emphasized that this

9

charge did not require the jury to find that Ray actually pointed the gun directly at

Kristin at any particular time:

> He took that gun into the room. He told her, "You go to fucking hell.
> You go to fucking hell, you fucking whore. If I could -- you're a
> fucking psycho."
>
> Those are the words that he told her while he had that firearm.
> Does it matter whether he was pointing that firearm at her or whether
> he had it with him while he was saying those words? His intent was
> to create fear, and that's what he did.

*Id.* at 1447. Similarly, the State's closing argument on the felony harassment

charge did not single out a *specific* act or statement as *the* threat to kill. Instead,

the State asked the jury to consider the entire incident:

> He doesn't have to say the words "I'm going to kill you" for
> him to be guilty of harassment. If the circumstances surrounding the
> situation of him pointing the gun at her and yelling at her and telling
> her he hates her, and that "You go to hell," right? -- that's harassment
> at that point.

*Id.* at 1448. Likewise, the State did not request a written jury instruction

specifying that the assault and harassment convictions must be based on separate

and distinct acts.

Ray's closing argument emphasized his mental state on the night of the

offenses. As noted above, Ray could not recall many of the events after Kristin

started speaking to the 911 operator, and he did not deny much of his alleged

conduct. However, he argued that he lacked the mens rea to commit the charged

10

offenses because his sole intent that night was "self-harm" and that his conduct did not represent a "threat to kill anybody other than himself." *Id.* at 1458, 1472.

Ray was convicted as charged of second degree assault with a deadly weapon and felony harassment (threat to kill), each with special verdicts finding aggravated domestic violence and use of a firearm. The trial court found the convictions were the "same criminal conduct" for scoring purposes[4] and imposed concurrent standard-range sentences with consecutive firearm enhancements, totaling 60 months' confinement.

Ray appealed, arguing in relevant part that his assault and harassment convictions violate double jeopardy principles. The Court of Appeals affirmed in an unpublished opinion. *State v. Ray*, No. 86163-8-I (Wash. Ct. App. Sept. 3, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/861638%20 orderandopinion.pdf. We granted review on the double jeopardy issue only. We now affirm the result reached by the Court of Appeals.

### ISSUE

Do Ray's convictions for second degree assault with a deadly weapon and felony harassment (threat to kill) violate the constitutional prohibition on double jeopardy?

---

[4] The trial court's "same criminal conduct" finding is not at issue on review. However, it should be noted that a statutory "same criminal conduct" finding for sentencing purposes is *not* the same as a constitutional double jeopardy analysis. *See* RCW 9.94A.589(1)(a).

ANALYSIS

A.     The type of double jeopardy claim presented in this case requires an analysis
       of the legal elements of both offenses

       To resolve Ray's double jeopardy claim, we must first determine the

applicable analysis.  The double jeopardy clause provides that "[n]o person

shall . . . be twice put in jeopardy for the same offense."  WASH. CONST. art. I, § 9;

*see also* U.S. CONST. amend. V.[5]  This constitutional "guarantee against double

jeopardy protects not only against a second trial for the same offense, but also

'against multiple punishments for the same offense.'"  *Whalen v. United States*,

445 U.S. 684, 688, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980) (quoting *North*

*Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969),

*overruled in part on other grounds by Alabama v. Smith*, 490 U.S. 794, 109 S. Ct.

2201, 104 L. Ed. 2d 865 (1989)).  As a result, there are several distinct types of

double jeopardy claims, each requiring a different analytical approach.

       This court has previously recognized "the difference in analysis between

multiple *prosecutions* and multiple *punishments*."  *Arndt*, 194 Wn.2d at 817 (citing

*State v. Allen*, 192 Wn.2d 526, 541, 431 P.3d 117 (2018)).  Here, because both of

Ray's convictions arise from a single prosecution, we must apply the analytical

framework for "multiple punishments."

---

[5] Ray has not argued for an independent interpretation of the state constitution.

Multiple punishments for the same offense "may implicate double jeopardy concerns, regardless of whether the sentences received are served concurrently." *Id.* at 815. Indeed, we have long acknowledged "the adverse consequences that could result from multiple convictions alone . . . 'even *without* imposition of [a] sentence,'" such as "the stigma and impeachment value of multiple convictions." *State v. Calle*, 125 Wn.2d 769, 774, 888 P.2d 155 (1995) (emphasis added) (quoting *State v. Johnson*, 92 Wn.2d 671, 679, 600 P.2d 1249 (1979)). Therefore, regardless of the sentence imposed, the double jeopardy clause prohibits multiple *convictions* for the same offense, just as it prohibits multiple *punishments* for the same offense. *See id.* at 773-75.

However, "'[t]he double jeopardy clause does not prohibit the imposition of *separate punishments* for *different offenses*.'" *Arndt*, 194 Wn.2d at 817 (quoting *State v. Noltie*, 116 Wn.2d 831, 848, 809 P.2d 190 (1991)). Thus, to resolve Ray's double jeopardy claim, we must determine whether his convictions for second degree assault and felony harassment both punish the *same* offense or, instead, punish two *different* offenses. Double jeopardy is violated if, but only if, both convictions punish the same offense.

The delineation of "offenses" is fundamentally a legislative function, rather than a judicial one. It is the legislature that "has the power to define criminal conduct and assign punishment," and "the prohibition on double jeopardy imposes

13

'[f]ew, if any, limitations' on that power." *Id.* at 815; *State v. Villanueva-Gonzalez*, 180 Wn.2d 975, 980, 329 P.3d 78 (2014) (alteration in original) (quoting *Sanabria v. United States*, 437 U.S. 54, 69, 98 S. Ct. 2170, 57 L. Ed. 2d 43 (1978)). Accordingly, to "determin[e] whether a defendant has suffered multiple punishments for the same offense," we must "determine what punishments the legislature has authorized." *Arndt*, 194 Wn.2d at 815. On this question, "'[o]ur review is de novo, and legislative intent is the touchstone.'" *State v. Muhammad*, 194 Wn.2d 577, 616, 451 P.3d 1060 (2019) (plurality opinion) (opinion of Gordon McCloud, J.) (quoting *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008)).

This court has adopted frameworks to guide our analysis of legislative intent in the double jeopardy context. The applicable analysis will vary "depending on whether the convictions at issue were under the *same* statutory provision or *different* statutory provisions." *Villanueva-Gonzalez*, 180 Wn.2d at 980 (emphasis added). Here, the convictions arise from different statutory provisions, specifically, the statutes criminalizing second degree assault with a deadly weapon and felony harassment (threat to kill).[6] *See* RCW 9A.36.021(1)(c); RCW

---

[6] By contrast, the petitioner in the pending case of *State v. Lee*, No. 103451-2, raises a double jeopardy challenge to multiple convictions based on the *same* statutory provision. As argued by the parties there, the type of claim in *Lee* involves a more fact-dependent analysis. *See* Suppl. Br. of Pet'r, *State v. Lee*, No. 103451-2, at 17-29 (Wash. 2025); Am. Suppl. Br. of Resp't, *State v. Lee*, No. 103451-2, at 7-17 (Wash. 2025). The type of claim in Ray's case focuses on the legal elements required to convict, as detailed below.

9A.46.020(1)(a)(i), (2)(b)(ii).  To resolve this type of double jeopardy claim, we apply a four-part analysis.

First, we consider "any express or implicit legislative intent" to authorize or prohibit separate punishments.  *Arndt*, 194 Wn.2d at 816.  "'If there is clear legislative intent to impose multiple punishments for the same act or conduct, this is the end of the inquiry and no double jeopardy violation exists.'"  *Id.* (quoting *State v. Kelley*, 168 Wn.2d 72, 77, 226 P.3d 773 (2010)).  However, if legislative intent is not clear, we must proceed to the second step.

The second step of our double jeopardy analysis is to apply the *Blockburger* test.  *Id.*  As detailed below, the *Blockburger* test "compare[s] the elements of the two offenses at issue to determine whether they are the same—the assumption being that the legislature 'ordinarily does not intend to punish the same offense under two different statutes.'"  *Muhammad*, 194 Wn.2d at 618 (opinion of Gordon McCloud, J.) (quoting *Whalen*, 445 U.S. at 691-92).  Though not dispositive, "the result of the *Blockburger* test 'creates a strong presumption of the legislature's intent.'"  *Id.* at 620 (quoting *State v. Louis*, 155 Wn.2d 563, 570, 120 P.3d 936 (2005)).

After applying *Blockburger*, we must determine whether there is sufficiently "clear evidence of legislative intent . . . to overcome the *Blockburger* presumption."  *Id.* at 620-21.  In relevant cases, we will apply the merger doctrine

as the third step of our double jeopardy analysis. However, the merger doctrine is applicable *only* in cases involving lesser included offenses. *See id.* at 618; *Arndt*, 194 Wn.2d at 816, 819. Here, it is undisputed that the merger doctrine does not apply because neither of Ray's convictions is a lesser included offense of the other.

Finally, the fourth step in our double jeopardy analysis requires the court to consider "other indicators of legislative intent" for "any 'clear evidence' [that] could overcome the *Blockburger* presumption." *Muhammad*, 194 Wn.2d at 621 (opinion of Gordon McCloud, J.) (quoting *Calle*, 125 Wn.2d at 780). For example, where *Blockburger* indicates that two offenses *are* the same, courts may consider "any independent purpose or effect that would allow punishment as a separate offense." *Arndt*, 194 Wn.2d at 816. Conversely, if *Blockburger* indicates that two offenses are *not* the same, we must determine whether the legislature nevertheless intended to "bar the courts from imposing separate punishments." *Muhammad*, 194 Wn.2d at 621 (opinion of Gordon McCloud, J.).

In applying this four-part double jeopardy analysis, Ray has the burden to establish that his assault and harassment convictions "are identical both in fact and in law." *Calle*, 125 Wn.2d at 777. If they are not the same, we must presume separate punishments for both convictions are authorized, absent "a clear indication of contrary legislative intent." *Id.* at 778.

B.      There is no express legislative intent to authorize or prohibit multiple punishments and implied legislative intent is unclear

The first step of our double jeopardy analysis is "consideration of any express or implicit legislative intent," which "start[s] with the language of the statutes themselves." *Arndt*, 194 Wn.2d at 816; *Calle*, 125 Wn.2d at 776. This is a crucial starting point because, in some cases, there is "clear legislative intent to impose multiple punishments for the same act," making further analysis unnecessary. *Kelley*, 168 Wn.2d at 77. For example, we have recognized that "[c]umulative punishment is clearly intended" for offenses subject to firearm enhancements, even "when an element of the underlying offense is use of a firearm." *Id.* at 80, 84. Similarly, the burglary antimerger statute "expressly authorizes cumulative punishment" for crimes committed during a burglary. *Calle*, 125 Wn.2d at 776 (citing RCW 9A.52.050).

In the context of second degree assault and felony harassment, legislative intent is not immediately clear. The relevant statutes do not contain any express language authorizing (or prohibiting) cumulative punishments for a single act that violates both statutes. *See* RCW 9A.36.021; RCW 9A.46.020. Moreover, although "[l]egislative intent may be express or implied," implied legislative intent is mixed. *Arndt*, 194 Wn.2d at 816 (citation and footnote omitted).

An important indicator of implied intent is "legislative inaction in the face of cases" interpreting the relevant statutes. *Id.* Courts look to such legislative

inaction as evidence of legislative intent because "[g]enerally, the legislature's failure to amend a statute after judicial construction of such statute signals legislative agreement with the construction." *Id.* However, as applied to the second degree assault and felony harassment statutes, different instances of legislative inaction arguably support different conclusions.

The relevant statutes were not amended in response to *State v. Mandanas*, which rejected a double jeopardy claim based on second degree assault and felony harassment because, as charged and proved in that case, the offenses were "not the same in law" and the statutes reflected "differences in aim and purpose." 163 Wn. App. 712, 720, 262 P.3d 522 (2011). The legislature's failure to act in response to *Mandanas* signals legislative agreement with its analysis and intent to authorize separate punishments for both offenses.

Nevertheless, *Mandanas* engaged in a case-specific analysis, which does not necessarily establish that *every* double jeopardy claim based on second degree assault and felony harassment must fail. To the contrary, *State v. Leming* held these convictions *can* violate double jeopardy in some cases. 133 Wn. App. 875, 887-89, 138 P.3d 1095 (2006). The legislature did not amend the relevant statutes in response, which could signal legislative agreement with *Leming*'s analysis.

Thus, there is no express statement of legislative intent to authorize separate punishments for second degree assault and felony harassment, and indicators of

implied legislative intent are mixed. As a result, we must proceed to the second step of our double jeopardy analysis and apply the *Blockburger* test. *See Arndt*, 194 Wn.2d at 818.

C.     Application of the *Blockburger* test shows that Ray's convictions are the same in fact but not in law

The *Blockburger* test is a rule of statutory construction to discern legislative intent in the double jeopardy context. As noted above, "[i]n order to qualify as the 'same offense' for double jeopardy purposes, the two offenses must be the same both in law and in fact." *Id.* at 815. Therefore, in cases "'where the same act or transaction constitutes a violation of two distinct statutory provisions,'" the *Blockburger* test is "'applied to determine whether there are two offenses or only one.'" *Orange*, 152 Wn.2d at 817 (emphasis omitted) (quoting *Blockburger*, 284 U.S. at 304).

*Blockburger* considers the legal elements of both offenses to determine "'whether each provision *requires proof of a fact* which the other does not.'" *Id.* (quoting *Blockburger*, 284 U.S. at 304). In other words, we must "compare the elements of the two offenses at issue to determine whether they are the same." *Muhammad*, 194 Wn.2d at 618 (opinion of Gordon McCloud, J.). If the *Blockburger* test indicates that two offenses are *not* the same, this "'creates a strong presumption'" that the legislature has authorized separate punishments for both. *Id.* at 620 (quoting *Louis*, 155 Wn.2d at 570). Conversely, if the

19

*Blockburger* test indicates that two offenses *are* the same, we presume the legislature intended to prohibit separate punishments. *Id.*

The *Blockburger* "test has been alternatively called the 'same elements' and the 'same evidence' test." *Orange*, 152 Wn.2d at 818. However, this terminology has occasionally required clarification. For instance, we have explained that the "'same elements'" test does *not* mean courts should merely "compare the statutory elements at their most abstract level." *Id.* To the contrary, when applying *Blockburger*, we must consider the legal elements of each offense "as charged *and proved*" at trial. *Muhammad*, 194 Wn.2d at 620 (opinion of Gordon McCloud, J.).

Similarly, the United States Supreme Court has noted that the phrase "'same evidence' test" can be "confus[ing]" regarding the nature of the inquiry. *Grady v. Corbin*, 495 U.S. 508, 521 n.12, 110 S. Ct. 2084, 109 L. Ed. 2d 548 (1990), *overruled on other grounds by United States v. Dixon*, 509 U.S. 688, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993) (partial plurality opinion).[7] The Court has clarified that "[t]he *Blockburger* test has nothing to do with the *evidence* presented at trial. It is concerned solely with the *statutory elements* of the offenses charged." *Id.* (second emphasis added). This focus on the statutory elements of each offense is necessary because the double jeopardy clause does not prohibit multiple

---

[7] *Dixon* overruled *Grady*'s adoption of a "'same-conduct' rule" for double jeopardy claims involving multiple *prosecutions*. 509 U.S. at 704. The overruling does not affect our analysis because Ray's double jeopardy claim involves multiple *punishments*, as noted above.

punishments based on the same *conduct* or the same *evidence*. Instead, as discussed above, the double jeopardy clause prohibits multiple punishments for the same *offense*, as defined by the legislature. *See, e.g.*, *Arndt*, 194 Wn.2d at 815; *Muhammad*, 194 Wn.2d at 616 (opinion of Gordon McCloud, J.); *Calle*, 125 Wn.2d at 777-78.

In this case, application of the *Blockburger* test shows that Ray's convictions for second degree assault and felony harassment are presumptively *not* the same offense. They are the same in *fact* because, as charged and proved at trial, both convictions are based on the same conduct. However, they are not the same in *law* because the elements of each offense required proof of a fact the other did not.

1.　Ray's convictions are the same in fact

To prove that both of his convictions unconstitutionally punish the same offense, Ray must show that they are "identical in fact." *Calle*, 125 Wn.2d at 778. The State argues Ray must satisfy this burden as a "prerequisite" to our four-part double jeopardy analysis and, in the State's view, he cannot do so because "separate incidents *could* have supported the guilty verdicts."[8] Suppl. Br. of Resp't at 4; Answer to Pet. for Rev. at 26 (emphasis added). We cannot agree. Ray's burden to show his convictions are the same "in fact" is a component of our

---

[8] Ray moved to strike this statement from the State's brief. His motion was denied in our order granting review.

four-part analysis, not a prerequisite to its application. *Arndt*, 194 Wn.2d at 815.

More importantly, however, we hold that Ray has met his burden on this issue.

As detailed above, Ray was charged with second degree assault with a

deadly weapon for pointing a firearm at Kristin and felony harassment (threat to

kill) for threatening to kill Kristin. Ray argues that the State "relied on the claim

that Mr. Ray pointed a gun at his wife to prove that he assaulted her *and* that he

harassed her," without electing separate acts supporting each charge. Appellant's

Opening Br. at 72 (Wash Ct. App. No. 57517-5-II (2023)). By contrast, the State

argues that Ray "aimed a firearm at [Kristin] at four separate and distinct points,"

any one of which could support either conviction. Suppl. Br. of Resp't at 7. In

assessing these competing arguments, we must "consider the elements as charged

*and proved*" by the State at trial, resolving any ambiguity in the light most

favorable to Ray. *Muhammad*, 194 Wn.2d at 620 (opinion of Gordon McCloud,

J.).; *see Kier*, 164 Wn.2d at 811.

As set forth above, it is true that Kristin testified to several distinct instances

where Ray pointed his gun at her. However, the State did *not* elect any particular

instance as the basis for either charge. Instead, the State emphasized in closing

arguments that *both* charges were based on *all* "the circumstances surrounding the

situation." 11 VRP (Sept. 22, 2022) at 1448 (harassment); *see also id.* at 1446 ("If

you don't point a gun at someone, but you bring a gun into an argument under

22

circumstances where it's clear that your intent is to create that apprehension and fear and it does . . . that's also assault."). Thus, the State expressly encouraged the jury to convict Ray of both charges based on the same conduct.

Consistent with its closing arguments, the State did not request a written jury instruction specifying that the assault and harassment charges must be based on distinct acts. The State now argues it was "denied an opportunity" to request such an instruction because Ray raised his double jeopardy claim for the first time on appeal. Answer to Pet. for Rev. at 21. However, jury instructions are issued *before* closing arguments, both in general and in this specific case. *See* CrR 6.15(d); 11 VRP (Sept. 22, 2022) at 1421-23. Yet, it is well established that the State may choose to "clearly distinguish between the acts" supporting the charges *during* closing arguments. *State v. Peña Fuentes*, 179 Wn.2d 808, 825, 318 P.3d 257 (2014). Therefore, Ray was not required to raise his double jeopardy claim before the jury was instructed; at that time, he could not know whether the State would rely on the same acts to prove both charges in closing arguments.

In sum, pursuant to the State's theory of the case at trial, Ray's assault and harassment convictions are "identical in fact." *Calle*, 125 Wn.2d at 778. Next, we must examine the elements of each offense to determine whether they are "identical in law." *Id.*

2.      Ray's convictions are not the same in law

To determine whether two offenses are the same in law, the *Blockburger* test asks "'whether each provision *requires proof of a fact* which the other does not.'" *Orange*, 152 Wn.2d at 817 (quoting *Blockburger*, 284 U.S. at 304).  If the to-convict elements for each offense "'would not be sufficient to sustain a conviction under the other,'" they are not the same in law.  *Id.* at 816 (quoting *State v. Reiff*, 14 Wash. 664, 667, 45 P. 318 (1896)).  In this case, the to-convict elements for second degree assault and felony harassment each required proof of a fact the other did not.  Therefore, they are not the same in law.

As discussed above, the jury was instructed on the to-convict elements of both offenses at trial.  To convict Ray of second degree assault, the jury was required to find Ray "*intentionally* assault[ed]" Kristin "with a deadly weapon" by committing an "act" to make Kristin feel "reasonable apprehension and imminent fear of *bodily injury*."  CP at 392-93 (emphasis added).  By contrast, to convict Ray of felony harassment, the jury was instructed that it must find Ray "*knowingly* threatened *to kill*" Kristin by "directly or indirectly" communicating his intent to kill her, using "words or conduct" that placed Kristin "in reasonable fear that the threat *to kill* would be carried out."  *Id.* at 408 (emphasis added), 399.  Thus, although the State relied on the same *conduct* to prove both charges, the *elements* required for each conviction were different.

24

The second degree assault charge expressly required proof of a *higher mens rea* (intentional) than the felony harassment charge (knowing). This distinction cannot be overlooked in the context of a *Blockburger* analysis. To the contrary, the legislature's decision to require different mental states for these two crimes strongly indicates they are *not* the same offense for double jeopardy purposes. Indeed, in Ray's case and many others, the defendant's mental state may be the most heavily disputed element at trial. As a result, Ray's conviction for felony harassment did not necessarily prove his conviction for second degree assault. Assault required proof of the additional fact that Ray acted with *intent*, not merely knowledge.

Yet, as instructed to the jury, felony harassment required proof of a *more serious threat* (to kill) than second degree assault (to cause bodily injury). We have recognized the importance of this distinction as a matter of law because "[o]ne placed in fear of being killed is, on a relative and general scale, harmed more than one who is threatened with bodily injury." *State v. C.G.*, 150 Wn.2d 604, 610, 80 P.3d 594 (2003). It was also an important factual distinction at Ray's trial because, as detailed above, he admitted to confronting Kristin with a gun, but he denied pointing the gun directly at her or threatening to kill anyone other than himself. As a result, the assault conviction did not necessarily prove the

harassment conviction. Harassment required proof of the additional fact that Ray

threatened to *kill* Kristin, not merely to injure her.

In sum, although Ray's assault and harassment convictions are both based

on the same conduct, the *Blockburger* test shows they are not the same in law.

Because each offense required proof of an element that the other did not, neither

conviction necessarily proved the other. Therefore, as charged and proved in this

case, second degree assault and felony harassment are presumptively *not* the same

offense for double jeopardy purposes.

D.     There is no clear evidence of legislative intent to prohibit separate
       punishments

The above application of the *Blockburger* test "'creates a strong presumption

of the legislature's intent'" to allow separate punishments for both of Ray's

offenses. *Muhammad*, 194 Wn.2d at 620 (opinion of Gordon McCloud, J.)

(quoting *Louis*, 155 Wn.2d at 570). In the final step of our double jeopardy

analysis, we must test the *Blockburger* presumption by looking for "clear evidence

of contrary intent" in the legislative history and statutory context. *Calle*, 125

Wn.2d at 780. In this case, there is no clear evidence of contrary legislative intent

to overcome the *Blockburger* presumption.

As discussed above, legislative history is inconclusive. The legislature did

not amend the relevant assault and harassment statutes in response to case law

recognizing a defendant's double jeopardy challenge. *See Leming*, 133 Wn. App.

26

875. This "legislative inaction" could indicate an intent to prohibit separate punishments, despite the *Blockburger* presumption to the contrary. *Arndt*, 194 Wn.2d at 816. Yet, the legislature also failed to amend the statutes in response to case law *rejecting* a defendant's double jeopardy challenge, which clearly supports the *Blockburger* presumption that separate punishments are authorized. *See Mandanas*, 163 Wn. App. 712. Moreover, although the relevant statutes have been amended several times over the years, none of these legislative amendments have clearly rejected the *Blockburger* presumption.

Similarly, the statutory context provides mixed indicators of legislative intent. The legislature is clearly aware of the potential for overlap between assault and harassment offenses, as assault is expressly included in the list of prior offenses that will elevate harassment to a felony. RCW 9A.46.060(4)-(8). The fact that one offense "explicitly cross-references" the other may indicate that the legislature did *not* intend to authorize separate convictions for assault and harassment based on a single act. *Muhammad*, 194 Wn.2d at 621 (opinion of Gordon McCloud, J.). However, assault and harassment are criminalized in different chapters of the RCW, indicating the legislature's intent to "protect different societal interests" and authorize separate punishments. *Arndt*, 194 Wn.2d at 820. The same intent is indicated by the legislature's choice to codify harassment as a unique offense in 1985, notwithstanding the existing statutes

criminalizing assault. *See* LAWS OF 1985, ch. 288. This statutory context provides, at best, mixed evidence of the legislature's intent.

Thus, other indicators of legislative intent are not sufficiently clear to overcome the *Blockburger* presumption. As a result, we must conclude that the legislature intended to authorize separate punishments for second degree assault and felony harassment, as charged and proved in this case.

## CONCLUSION

In accordance with the *Blockburger* test, Ray's convictions for second degree assault with a deadly weapon and felony harassment (threat to kill) are not the same offense in law. Furthermore, there is no clear evidence of legislative intent to prohibit separate punishments for both offenses. Therefore, the convictions do not violate the constitutional prohibition on double jeopardy. We affirm the Court of Appeals in result and affirm Ray's convictions.

Yu, J.

WE CONCUR:

Stephens, C.J.

Gordon McCloud, J.

Johnson, J.

Montoya-Lewis, J.

Madsen, J.

Whitener, J.

González, J.

Mungia, J.