# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59223-1-II |
| Respondent, | |
| v. | |
| WILIAM EMORY MCDOWELL, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — William E. McDowell appeals his convictions and sentence. McDowell argues that: (1) the trial court abused its discretion by granting his motion for self-representation because his request was not unequivocal and his waiver of counsel was not knowing and intelligent, (2) the trial court erred by allowing the State to exercise a peremptory strike against a juror in violation of GR 37, (3) his convictions violated double jeopardy because his felony harassment conviction should have merged with his second degree kidnapping conviction, and (4) his current sentence exceeds the statutory maximum.

We hold that the trial court did not abuse its discretion in granting McDowell's motion for self-representation. In addition, the trial court did not err in allowing the State to exercise a peremptory strike. However, McDowell's felony harassment conviction violates double jeopardy, and his current sentence exceeds the statutory maximum. Accordingly, we affirm McDowell's convictions except for McDowell's felony harassment conviction, which we vacate, and we remand to the trial court to resentence McDowell consistent with this opinion.

FACTS

A.    BACKGROUND

In August 2021, McDowell began living with his then-romantic partner, Tahaira Spice.  On October 27, 2022, Spice texted McDowell when he was on his way home from work to inform him that she accidentally burnt their dinner.  McDowell called Spice and yelled at her over the phone.  Spice responded that the two were "done," he could not come home, and he had one week to retrieve his belongings from the home.  2 Verbatim Rep. of Proc. (VRP) (Dec. 5, 2023) at 198.

Around 4 p.m. the next day, Spice was preparing to meet her daughter at a night market where they worked.  Spice stepped into her garage to gather items for the market.  McDowell appeared from behind a storage shelf and began punching Spice's face and kicking her legs.  McDowell pulled Spice into the hallway and tried to zip tie her legs together, but he was unsuccessful.  McDowell dragged Spice toward his bedroom, grabbed his gun, told Spice to "get into the room," and forced Spice to stand against the wall.  2 VRP (Dec. 5, 2023) at 208.  In the bedroom, McDowell told Spice "how he [was] going to kill [her] and that he hate[d] her."  2 VRP (Dec. 5, 2023) at 218.  McDowell also told Spice that she was "go[ing] [to] die today."  2 VRP (Dec. 5, 2023) at 218.  At one point, McDowell told Spice to "get down on the ground," and McDowell fired a shot to the left of Spice's face.  2 VRP (Dec. 5, 2023) at 208.

During this encounter, Spice's daughter called Spice's cell phone several times, and McDowell allowed Spice to answer the phone on speakerphone.  Spice told her daughter that she could no longer meet at the market because she "didn't feel good."  2 VRP (Dec. 5, 2023) at 225.  Spice's daughter repeatedly probed to determine what was wrong, and eventually, McDowell agreed that he and Spice could go to the market.  The two went upstairs to Spice's bedroom so she

could get dressed, and McDowell reloaded the gun, telling Spice that "he hate[d] [her] and [she] did this to [her]self." 2 VRP (Dec. 5, 2023) at 229.

Spice drove her car to the market, and McDowell sat in the passenger seat, pointing the gun at her and reminding her, "'Don't try nothing funny.'" 2 VRP (Dec. 5, 2023) at 234. When they arrived, McDowell demanded Spice's car keys. Spice entered the market and called 911. When law enforcement arrived, Spice exited the market, but McDowell and Spice's car were gone.

Law enforcement located McDowell in his own vehicle on November 10, 2022. Law enforcement found a 9-mm gun in the front seat of the vehicle.

On June 23, 2023, the State charged McDowell by amended information with seven counts:

Count 1: first degree kidnapping on or about October 28, 2022, against an intimate partner with a firearm sentencing enhancement;

Count 2: first degree burglary on or about October 28, 2022, against an intimate partner with a firearm sentencing enhancement;

Count 3: second degree assault on or about October 28, 2022, against an intimate partner with a firearm sentencing enhancement;

Count 4: felony harassment on or about October 28, 2022, against an intimate partner with a firearm sentencing enhancement;

Count 5: first degree unlawful possession of a firearm on or between October 28, 2022, and November 10, 2022;

Count 6: second degree taking a motor vehicle without permission on or about October 28, 2022, against an intimate partner with a firearm sentencing enhancement; and

Count 7: fourth degree assault on or about October 28, 2022, against an intimate partner.

In February 2023, the State made a plea offer to McDowell, and the proposed plea agreement included McDowell pleading guilty to only the first degree burglary charge, the second

degree assault charge, and the first degree unlawful possession of a firearm charge. The remainder of the charges and all firearm sentencing enhancements would be dismissed under the plea offer. The plea agreement also provided that if McDowell was convicted as charged at trial, his standard sentencing range would be 149 to 198 months, with an additional 60 months for the firearm sentencing enhancement for a total of 209 to 258 months for the first degree kidnapping charge. In addition, the plea offer informed McDowell that the first degree burglary charge was a class A felony with a standard range sentence of 87 to 116 months of confinement and a maximum term of life, the second degree assault charge was a class B felony with a standard range sentence of 63 to 84 months of confinement and a maximum term of 10 years, and the first degree unlawful possession of a firearm charge was a class B felony with a 77 to 102 month standard range sentence and a maximum term of 10 years. McDowell did not accept the State's plea offer.

B.    MOTION FOR SELF-REPRESENTATION

On June 15, 2023, at his trial readiness hearing, McDowell moved for withdrawal and substitution of counsel, and he requested to represent himself. McDowell explained that he would prefer to represent himself because he and his defense counsel "d[id] not communicate; [they] haven't communicated." VRP (June 15, 2023) at 7. McDowell's defense counsel informed the trial court that the communication had not broken down to the point where she could not effectively represent McDowell. Because the case was scheduled for trial in 13 days, the trial court denied McDowell's request for self-representation.

On June 27, before a different judge, McDowell again moved to represent himself and for a continuance to prepare for trial. The trial court and McDowell engaged in the following exchange:

4

THE COURT: . . . You are wanting to represent yourself, and you are requesting a continuance so that you, essentially, have more time to prepare to represent yourself; is that correct?

THE DEFENDANT: Yes, ma'am.

THE COURT: Is there anything else that you are requesting, or is the Court clear about what you—the entirety of your request?

THE DEFENDANT: Yes ma'am. Like I said . . . in the affidavit, you know, due to my denial of . . . the right to substitute counsel and—and pro se, I wanted to—you know, I wanted—I felt that I had to proceed pro se.

VRP (June 27, 2023) at 15-16.

Prior to further colloquy between the trial court and McDowell, the trial court asked: "[C]ounsel, anyone can tell me this. What is the maximum sentence and fine that's associated with these charges?" VRP (June 27, 2023) at 16. The State informed the trial court that the maximum sentence was life in prison and that "[i]t's a Class A, a serious violent felony." VRP (June 27, 2023) at 16.

The trial court then informed McDowell that it would "go over some questions with [him]" to ensure he was "fully aware" and "fully considered everything that is involved in representing [him]self." VRP (June 27, 2023) at 16. The trial court inquired into whether McDowell had ever studied the law or represented himself in a criminal action. McDowell informed the trial court that he was not an attorney but studied in the law library, and he represented himself in a federal appeal.

The trial court proceeded to engage in a colloquy with McDowell that included a discussion of all the charges filed against him, the maximum possible sentence he faced if convicted, and the sentencing consequences related to the firearm sentencing enhancements. McDowell confirmed that he is aware of the consequences discussed. After ensuring McDowell understood the trial

would be governed by the rules of evidence and criminal procedure, the trial court inquired into McDowell's reason for his request to self-represent:

> THE COURT: Mr. McDowell, you are requesting to represent yourself at trial; correct?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: Okay. That is still your request, so what that tells the Court is that you do not want an attorney to represent you if you're choosing to represent yourself—
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT:—is that correct?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: So tell me why you don't want an attorney to represent you; why you want to represent yourself.
>
> THE DEFENDANT: At this time, I feel that I can put more into researching the evidence. I know more of the facts. I'm not bombarded with a heavy caseload and all I want is the truth. I want to be heard, and I understand the rules of criminal procedure and the laws of evidence but there are mitigating, viable issues that I feel I can present.

VRP (June 27, 2023) at 21-22.

The trial court then confirmed that McDowell's request to self-represent was not because of any threats or promises and advised McDowell that he would be better defended by an attorney. After this colloquy, McDowell confirmed he still wanted to represent himself.

The trial court granted McDowell's motion for self-representation and continued the trial date. The case proceeded to a jury trial in December 2023.

C.     GR 37 CHALLENGE

During voir dire, the trial court asked the venire whether anyone had a close friend or relative who had experience with domestic violence. One juror, juror 20 (Juror 20), explained her history and current experience with domestic violence in a colloquy with the State:

> [JUROR 20]: . . . I feel like I've been around this my entire life. My dad used to beat my mom. Then he beat on pretty much anybody he was with, and then he started beating on me after she left. Everyone I've dated has put their hands on me. My sisters. Yeah.
>
> . . . .
>
> [THE STATE]: You've been a victim of domestic violence?
>
> [JUROR 20]: Mm-hmm.
>
> [THE STATE]: Your mom's been a victim of domestic violence? And so you've been around this your whole life, it sounds like?
>
> [JUROR 20]: Currently. I'm married.
>
> . . . .
>
> [THE STATE]: Do you feel like given the personal experiences you have with this kind of subject matter, you could be a fair juror in this case?
>
> [JUROR 20]: Mm-hmm.
>
> [THE STATE]: To Mr. McDowell?
>
> [JUROR 20]: Mm-hmm. I'm with my husband still.

VRP (Dec. 4, 2023) at 93-95. Several other jurors stated that they had family members who experienced domestic violence, worked with victims of domestic violence, had been convicted of domestic violence, or had previously been involved in a domestic violence relationship.

The next day, the parties exercised peremptory challenges. The State exercised peremptory challenges to excuse jurors 4, 5, 15, 18, 20, and 23. McDowell objected under GR 37 to the State's

peremptory challenge of Juror 20. Explaining the reason for its peremptory challenge to excuse

Juror 20, the State provided:

> First, I would just—I looked at Juror Number 20 before she left the room. I thought Juror Number 20 was a Caucasian woman. When I looked at her, at least prior to that, I hadn't thought about what her race or ethnicity was.
>
> Juror Number 20 answered some of my questions about having experience with domestic violence. She specifically said in her answers that her mother had been a victim of domestic violence at the hands of her father, that she herself had been a victim of domestic violence—I believe she said by her husband—and that potentially was ongoing. She did answer my questions about whether, notwithstanding that experience, that personal experience with domestic violence, she could—she said that she could set that experience aside. The basis for my peremptory challenge is just given her own experience with this type of a subject matter of a case, domestic violence, and her responses, I have some concern that she could treat both parties fairly, and that's the basis for my peremptory challenge here, in addition to what I've already said about—it didn't appear to me that Juror Number 20 was cognizable with racial or ethnic minority.

2 VRP (Dec. 5, 2023) at 151-52. McDowell explained that he believed Juror 20 was "either Latin

or Native American." 2 VRP (Dec. 5, 2023) at 152-53. And the trial court stated that "Juror

Number 20 does appear to be a Caucasian woman. That doesn't mean, however, that she might

not . . . also be a person of color." 2 VRP (Dec. 5, 2023) at 153.

Upon the trial court's request, the State examined the presumptively invalid reasons for

peremptory challenges under GR 37(h). The State explained that the following presumptively

invalid reasons were not applicable based on the colloquy with Juror 20: prior contact with law

enforcement officers, distrust of law enforcement or belief that law enforcement engages in racial

profiling, living in a high-crime neighborhood, having a child outside of marriage, receiving state

benefits, and not being a native English speaker. The State recalled that Juror 20 and her mother

were victims of domestic violence but did not recall answers about whether that resulted in

criminal convictions such that Juror 20 would have a close relationship with people who have been stopped, arrested, or convicted of a crime.

The trial court also recognized that "this is the State's fifth peremptory challenge, and so far, [the State] has not struck a person of color." 2 VRP (Dec. 5, 2023) at 158. The trial court noted, "[T]he State's first peremptory [was] Number 4, a Caucasian woman; second peremptory [was] Number 5, . . . also a Caucasian woman; the third peremptory exercised [was] . . . a Caucasian male, Number 15; and then the fourth [was] . . . Number 18, also a Caucasian female." 2 VRP (Dec. 5, 2023) at 157.

The trial court then conducted a GR 37 analysis. The trial court "did not note that [the State] asked Juror Number 20 any different types of questions or more significant questions than any other juror." 2 VRP (Dec. 5, 2023) at 157. The trial court also found that the stated reason for the peremptory challenge was not presumptively invalid under GR 37(h), and it was not historically associated with improper discrimination. The trial court concluded:

> Viewed objectively, I don't believe there's anything in the record that suggests that [the State's] peremptory challenge against Juror 20 has anything to do with the fact that she may be a person of color. And this whole analysis is predicated on the belief or the assumption that she is, and it's unclear to this Court whether she is or not. But the standard is the totality of circumstances, including the considerations under GR 37(g), lead an objective observer to conclude that race could have been a factor in [the State's] decision to exercise a peremptory challenge. And this Court just does not see how under GR 37 an objective observer could believe that race was a factor in the use of [the State's] fifth peremptory.

2 VRP (Dec. 5, 2023) at 160. Accordingly, the trial court overruled McDowell's GR 37 objection.

The panel included three jurors that the trial court believed to be jurors of color.

D.      TRIAL

At trial, the State's witnesses testified to the facts as described above.  After McDowell rested his case, the trial court provided instructions to the jury, which included lesser-included offenses for the first degree kidnapping charge.[1]  During closing arguments, the State explained to the jury how McDowell's conduct met the required elements for each count charged.

For first degree kidnapping, the State identified when McDowell retrieved his gun from the downstairs bedroom and restrained Spice through the threat of deadly force.  The State argued that "he [was] restraining her through the threat of deadly force and even [went] a step further than that when he fire[d] the gun and show[ed] the demonstrated use of deadly force to get her to be restrained in that room."  6 VPR (Dec. 12, 2023) at 635-36.  When arguing the lesser-included offense of second degree kidnapping, the State argued that McDowell "abducted [Spice] downstairs, upstairs, in her car with the use of that firearm, threatening her with deadly force," such that "[k]idnapping in the [s]econd [d]egree would absolutely be proved beyond a reasonable doubt based on this evidence."  6 VRP (Dec. 12, 2023) at 637.

As to the second degree assault charge, the State identified when McDowell fired the gun near Spice.

For the felony harassment charge, the State argued that McDowell "was making more than just threats to kill than just 'I'm going to kill you.'"  6 VRP (Dec. 12, 2023) at 647.  The State contended that McDowell "was saying it in ways that would make [Spice] believe that he was going to kill her," and "[h]e demonstrated it through his conduct by firing the gun by her."  6 VRP

---

[1] The jury was instructed on the lesser offenses of second degree kidnapping and unlawful imprisonment.

(Dec. 12, 2023) at 647. The State argued that by firing the gun, McDowell "demonstrate[d] to her that he [was] willing to go forward with this threat that he's just made to her." 6 VRP (Dec. 12, 2023) at 647-48.

As to the first degree unlawful possession of a firearm charge, the State referenced the firearm that McDowell used in Spice's home and in the vehicle when law enforcement contacted him.

For second degree taking of a motor vehicle without permission, the State referenced when McDowell took Spice's keys, drove away in the car without her permission, and then he kept the car for seven hours.

Finally, for fourth degree assault, the State identified when McDowell punched Spice in the face.

At the conclusion of trial, the jury found McDowell guilty of the following:

Count 1: second degree kidnapping against an intimate partner with a firearm sentencing enhancement;

Count 3: second degree assault against an intimate partner with a firearm sentencing enhancement;

Count 4: felony harassment against an intimate partner with a firearm sentencing enhancement;

Count 5: first degree unlawful possession of a firearm;

Count 6: second degree taking a motor vehicle without permission against an intimate partner with a firearm sentencing enhancement; and

Count 7: fourth degree assault against an intimate partner.

E.      SENTENCING

In his sentencing memorandum, McDowell argued that his felony harassment and his fourth degree assault convictions should be vacated because they should have merged with his second degree kidnapping conviction. The judgment and sentence shows that the trial court denied this motion. At sentencing, the State moved to vacate McDowell's second degree assault conviction, which the trial court granted because it merged with his second degree kidnapping conviction.

The trial court then sentenced McDowell to a total term of 149 months of confinement.[2] The trial court also imposed 18 months of community custody related to McDowell's second degree kidnapping conviction.

McDowell appeals.

---

[2] Specifically, the trial court imposed 77 months of confinement for the second degree kidnapping conviction, 42 months of confinement for the felony harassment conviction, 77 months of confinement for first degree unlawful possession of a firearm, and 29 months of confinement for second degree taking a motor vehicle without permission, with all sentences to be served concurrently. The trial court also imposed 364 days of confinement based on the fourth degree assault conviction, also to be served concurrently with the sentences on the other convictions.

In addition, the trial court imposed the following terms of confinement for the firearm sentencing enhancements with each sentencing enhancement to be served consecutive to each other: 36 months for the second degree kidnapping firearm sentencing enhancement, 18 months for the felony harassment firearm sentencing enhancement, and 18 months for the second degree taking a motor vehicle without permission firearm sentencing enhancement, for a total term of 72 months of confinement for the firearm sentencing enhancements to be served consecutive to the sentence imposed for the convictions.

Thus, the total in-custody term imposed by the trial court was 149 months.

ANALYSIS

McDowell argues that the trial court abused its discretion by allowing him to represent himself without an unequivocal request and without a knowing and intelligent waiver of counsel. He also contends that the trial court erred by allowing the State to exercise a peremptory strike against Juror 20 in violation of GR 37. Further, McDowell argues that his felony harassment conviction should merge with his second degree kidnapping conviction. Finally, McDowell argues that he should be resentenced because his current sentence exceeds the statutory maximum.

A.    SELF-REPRESENTATION

McDowell argues that the trial court abused its discretion by granting his motion for self-representation without an unequivocal request and without a knowing and intelligent waiver of counsel. We disagree.

1.    Legal Principles

Article I, section 22 of the Washington Constitution and the Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to assistance of counsel. "The same constitutional provisions also provide a criminal defendant with a right to self-representation." *State v. Howard*, 1 Wn. App. 2d 420, 424, 405 P.3d 1039 (2017). "The right of self-representation is 'so fundamental that it is afforded despite its potentially detrimental impact on both the defendant and the administration of justice.'" *Id.* (quoting *State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010)). However, a trial court must apply every presumption against a waiver of the right to counsel. *State v. Curry*, 191 Wn.2d 475, 487, 423 P.3d 179 (2018).

We first determine whether a request for self-representation is "unequivocal and timely." *State v. Burns*, 193 Wn.2d 190, 203, 438 P.3d 1183 (2019). Next, if a request for self-

representation is unequivocal and timely, "a trial court must then determine if the request is knowing, voluntary, and intelligent" through a colloquy between the defendant and the trial court on the record. *Id.*

We review a trial court's decision on a defendant's motion to waive their right to counsel for abuse of discretion. *Curry*, 191 Wn.2d at 483. An abuse of discretion occurs when a decision is "manifestly unreasonable, based on untenable grounds, or based on an erroneous view of the law." *Howard*, 1 Wn. App. 2d at 425. "We give great deference to the trial court's discretion because the trial court is in a favorable position to the appellate courts in evaluating a request to proceed [as a self-represented litigant]." *Burns*, 193 Wn.2d at 202.

2.      Unequivocal Request[3]

McDowell argues that his request for self-representation was equivocal because his request "evinced a desperate plea to be represented competently by an attorney—not to waive his right to counsel." Br. of Appellant at 20. We disagree.

"The threshold issues of timeliness and equivocality focus on the nature of the request itself—if, when, and how the defendant made a request for self-representation—not on the motivation or purpose behind the request." *Curry*, 191 Wn.2d at 486-87. In determining whether a request for self-representation is unequivocal, the trial court asks two questions: "(1) Was a request made? If so, (2) was that request unequivocal?" *Id.* at 487.

The determination of equivocality depends on the specific facts and circumstances of the case. *Id.* The court may consider "whether the request was made as an alternative to other, preferable options and whether the defendant's subsequent actions indicate the request was

---

[3] The timeliness of McDowell's request is not an issue raised on appeal.

unequivocal." *Id.* at 489. An unequivocal request for self-representation is valid even if combined with an alternative request for new counsel, but the request "'may be an indication to the trial court, in light of the whole record, that the request is not unequivocal.'" *Id.* (quoting *State v. Stenson*, 132 Wn.2d 668, 740-41, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998)). "And if the defendant makes an explicit request to proceed [as a self-represented litigant], that request is not necessarily rendered equivocal simply because it is motivated by a purpose other than a desire to represent him- or herself, such as frustration with the speed of trial or an attorney's performance." *Id.*

Here, although McDowell also requested a different attorney in the early discussions regarding his request to self-represent, during the June 27 hearing, McDowell repeated several times that he wanted to represent himself. And McDowell did not alternatively request substitute counsel at the June 27 hearing; McDowell only moved for self-representation and a trial continuance. Moreover, although McDowell's decision to represent himself may have been motivated by his frustration with defense counsel, McDowell explained to the trial court that he felt he knew more of the facts and could dedicate more time to his case because he was not burdened by a heavy caseload. Despite McDowell's discussions of his prior frustrations with counsel, McDowell repeatedly and explicitly stated that he wanted to represent himself. Accordingly, we hold that McDowell's request for self-representation was unequivocal.

3.      Knowing and Intelligent Waiver

McDowell also argues that he did not knowingly and intelligently waive his right to counsel because he did not understand the nature of the charges against him and the range of punishment he faced. In support of his argument, McDowell cites to the "incomplete, inaccurate, and

15

misleading information" that he received during his colloquy with the trial court. Br. of Appellant at 28.

In deciding a request to self-represent, a trial court's colloquy with a defendant is the "'preferred means'" to ensure a defendant "'understand[s] the risks of self-representation.'" *Howard*, 1 Wn. App. 2d at 426 (quoting *City of Bellevue v. Acrey*, 103 Wn.2d 203, 211, 691 P.2d 957 (1984)). "The colloquy should generally include a discussion of the nature of the charges against the defendant, the maximum penalty, and the fact that the defendant will be subject to the technical and procedural rules of the court in the presentation of his case." *Burns*, 193 Wn.2d at 203. Absent a colloquy, "the record 'must somehow otherwise show that the defendant understood the seriousness of the charges and knew the possible maximum penalty.'" *Howard*, 1 Wn. App. 2d at 426 (quoting *Acrey*, 103 Wn.2d at 211)). In making its determination, trial courts can also consider factors such as education, experience with the justice system, mental health, and competency. *Burns*, 193 Wn.2d at 203.

When determining whether the waiver of counsel is knowing, voluntary, and intelligent, "the trial court must indulge every reasonable presumption against waiver of the right to counsel." *Howard*, 1 Wn. App. 2d at 425. The trial court may deny a defendant's request for self-representation if the request is "'made without a general understanding of the consequences.'" *Id.* (quoting *Madsen*, 168 Wn.2d at 505).

Here, the trial court and the parties discussed McDowell's possible penalty in the following colloquy:

> THE COURT: Okay. And do you realize that if you're found guilty of more than one of those crimes, well, that you will have life in prison?
>
> THE DEFENDANT: Yes, ma'am.

16

> [DEFENSE COUNSEL]: Your Honor, that's not accurate.
>
> [THE STATE]: That would be a maximum possible sentence. . . .
>
> . . . .
>
> . . . And I could tell the Court that for kidnapping in the first degree, which is the most serious charge that he's facing, if he was . . . convicted of that and his offender score was 9, which is the maximum offender score, the standard-range sentence would be in the area of 180 to 240 months; plus, he could face a firearm sentencing enhancement of 60 months where a jury could return that as well.

VRP (June 27, 2023) at 17-18.

Although McDowell argues that he could not knowingly or intelligently waive his right to counsel based on this information, McDowell was correctly informed of the maximum possible sentence—life in confinement. Moreover, McDowell received a plea offer only four months prior to this motion to self-represent that provided the statutory maximum of life, as well as information on the firearm sentencing enhancement if he were convicted at trial as charged. A defendant's decision to accept a plea offer is a significant decision such that McDowell would have been well aware of the maximum possible penalty he would face after a trial based on a conversation with his defense counsel surrounding the plea offer. In addition, McDowell was aware of the nature of the charges based on the trial court's reading of his charges and discussion of the consequences related to the firearm sentencing enhancements, as well as from the information in the State's plea offer. And McDowell demonstrated experience with the justice system when he informed the trial court that he had previously represented himself in a federal appeal. Accordingly, the record demonstrates that McDowell's waiver of counsel was knowing and intelligent. Therefore, the trial court did not abuse its discretion in granting McDowell's request for self-representation.

B. GR 37

McDowell next argues that his convictions should be reversed because the trial court improperly "allowed the State to exercise a peremptory strike against Juror 20 in violation of GR 37." Br. of Appellant at 35. McDowell contends that an objective observer could view race or ethnicity as a factor in the State's peremptory challenge.

1. Legal Principles

The Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution require a fair and impartial jury. *State v. Tesfasilasye*, 200 Wn.2d 345, 356, 518 P.3d 193 (2022). Both parties and jurors alike have the right to a trial process free from discrimination. *Id.* "The purpose of [GR 37] is to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a).

We review GR 37 objections de novo. *State v. Bell*, 5 Wn.3d 54, 65, 571 P.3d 272 (2025). We examine the "reason given to justify the peremptory challenge in light of the totality of circumstances and determine if an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." *Id.* at 66-67. GR 37(g) provides a nonexclusive list of circumstances that should be considered. *Id.* at 67.

We first consider "the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it." GR 37(g)(i).

Second, we examine "whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors." GR 37(g)(ii).

Third, we evaluate "whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party." GR 37(g)(iii).

Fourth, we assess whether the State's given reason "might be disproportionately associated with a race or ethnicity." GR 37(g)(iv).

Finally, we consider "whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases." GR 37(g)(v).

2.     GR 37(g) Analysis

Here, the State exercised a peremptory strike to excuse Juror 20. McDowell objected under GR 37 because he believed Juror 20 was a person of color. Under the totality of the circumstances, an objective observer could not view race or ethnicity as a factor in exercising a peremptory strike. The State offered the following reason for the challenge:

> Juror Number 20 answered some of my questions about having experience with domestic violence. She specifically said in her answers that her mother had been a victim of domestic violence at the hands of her father, that she herself had been a victim of domestic violence—I believe she said by her husband—and that potentially was ongoing. . . . The basis for my peremptory challenge is just given her own experience with this type of a subject matter of a case, domestic violence, and her responses, I have some concern that she could treat both parties fairly, and that's the basis for my peremptory challenge here.

VRP (Dec. 5, 2023) at 152.

First, the State asked Juror 20 similar follow-up questions, in quantity and content, to those asked of other jurors. Second, the questions posed to Juror 20 were no different from those asked of other jurors who expressed experience with domestic violence. Each of these jurors answered

a few follow-up questions about their proximity to those circumstances, and the State asked whether those experiences would affect their role as a juror. This was also the case with Juror 20. Third, as the State explained in its reason for the peremptory challenge, Juror 20 was the only juror who expressed that she was currently in a relationship that involved domestic violence. Although other jurors stated that they had close family members in such relationships or that they had previously experienced domestic violence, Juror 20 was the only juror that referenced an ongoing relationship of that nature. Fourth, the State's basis for exercising a peremptory challenge was that Juror 20 was a victim of domestic violence by her husband, and Juror 20 was still in that relationship. This reason is not associated with race or ethnicity. Finally, Juror 20 was the State's fifth peremptory challenge. There is no indication in the record that the State disproportionately exercised peremptory challenges against a given race or ethnicity, and the jury panel included jurors of different races. Moreover, the State's reasons for the peremptory challenge were not presumptively invalid under GR 37(h) or historically associated with improper discrimination in jury selection under GR 37(i).

Under the totality of the circumstances, an objective observer could not view race or ethnicity as a factor in the State's peremptory challenge against Juror 20. The State's legitimate reason for the challenge was based on Juror 20's current involvement in a domestic violence relationship, which no other juror expressed. The State did not exercise peremptory challenges against other jurors of a given race or ethnicity, and jurors of different races were selected for the final jury panel. Viewed objectively, nothing in the record suggests that McDowell's peremptory challenge against Juror 20 was based on race or ethnicity. Accordingly, the trial court did not err by overruling McDowell's GR 37 objection.

C.    DOUBLE JEOPARDY

McDowell also argues that his convictions for both second degree kidnapping and felony harassment violate double jeopardy because his felony harassment conviction should have merged into his kidnapping conviction.  We agree.

1.    Legal Principles

The United States and Washington constitutions provide that no person shall be "twice put in jeopardy" for the same offense.  U.S. CONST. AMEND. V; WASH. CONST. art. I, § 9.  "'The prohibition on double jeopardy generally means that a person cannot be prosecuted for the same offense after being acquitted, be prosecuted for the same offense after being convicted, or receive multiple punishments for the same offense.'"  *State v. Lee*, 5 Wn.3d 734, 743-44, 582 P.3d 271 (2026) (quoting *State v. Villanueva-Gonzalez*, 180 Wn.2d 975, 980, 329 P.3d 78 (2014)).  "However, '[t]he double jeopardy clause does not prohibit the imposition of *separate punishments* for *different offenses*.'"  *State v. Ray*, 5 Wn.3d 350, 362, 575 P.3d 321 (2025) (alterations in original) (internal quotation marks omitted) (quoting *State v. Arndt*, 194 Wn.2d 784, 817, 453 P.3d 696 (2019), *cert. denied*, 142 S. Ct. 726 (2021)).

In the context of multiple punishments, the key question is whether the legislature intended to impose separate punishments.  *Arndt*, 194 Wn.2d at 815.  "'If the legislature authorized cumulative punishments for both crimes, then double jeopardy is not offended.'"  *Id.* at 815-16 (quoting *State v. Freeman*, 153 Wn.2d 765, 771, 108 P.3d 753 (2005)).  "'[L]egislative intent is the touchstone.'"  *Ray*, 5 Wn.3d at 363 (internal quotation marks omitted) (quoting *State v. Muhammad*, 194 Wn.2d 577, 616, 451 P.3d 1060 (2019) (plurality opinion) (separate opinion of Gordon McCloud, J., with Stephens and Yu, JJ. concurring)).

21

We review double jeopardy claims de novo. *Lee*, 5 Wn.3d at 743. To determine legislative intent when convictions arise from different statutory provisions, we apply a four-part analysis: (1) consideration of any express or implicit legislative intent, (2) application of the *Blockburger*[4] test, (3) application of the merger doctrine, and (4) consideration of other indicators of legislative intent. *Ray*, 5 Wn.3d at 363-64.

2.      Second Degree Kidnapping and Felony Harassment

a.      Legislative intent

First, courts consider whether there is any express or implied articulation of legislative intent. *Arndt*, 194 Wn.2d at 818.

RCW 9A.40.030 and RCW 9A.46.020, which address second degree kidnapping and harassment respectively, do not expressly authorize or prohibit cumulative punishments for a single act that violates both statutes. And neither party has provided any evidence of explicit or implicit legislative intent with respect to second degree kidnapping and felony harassment.

b.      *Blockburger* test

Second, if legislative intent is not clear, we apply the *Blockburger* test. *Ray*, 5 Wn.3d at 364. "'[W]here *the same act or transaction* constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision *requires proof of a fact* which the other does not.'" *Arndt*, 194 Wn.2d at 818 (emphasis in original) (alteration in original) (internal quotation marks omitted) (quoting *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 817, 100 P.3d 291 (2004)). The *Blockburger* test focuses on the statutory elements of each offense "because the double jeopardy clause does not

---

[4] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed 306 (1932).

prohibit multiple punishments based on the same *conduct* or the same *evidence*." *Ray*, 5 Wn.3d at 368 (emphasis in original). Rather, "the double jeopardy clause prohibits multiple punishments for the same *offense*, as defined by the legislature." *Id.* (emphasis in original).

If the two offenses are not the same, there is "'a strong presumption'" of the legislature's intent to authorize separate punishments. *Id.* at 367 (internal quotation marks omitted) (quoting *Muhammad*, 194 Wn.2d at 620). If the offenses are the same under the *Blockburger* test, we presume the legislature intended to prohibit separate punishments. *Id.*

The jury was instructed on the to-convict elements of both offenses at trial. To convict McDowell of second degree kidnapping, the jury was required to find that McDowell "intentionally abducted" Spice. Clerk's Papers (CP) at 97; *see* RCW 9A.40.030. "Abduct means to restrain a person by using or threatening to use deadly force." CP at 92; *see* RCW 9A.40.010(1). To convict McDowell of felony harassment, the jury was required to find that McDowell "knowingly threatened to kill" Spice by "words or conduct of the defendant" that placed Spice "in reasonable fear that the threat to kill would be carried out." CP at 113; *see* RCW 9A.46.020.

The second degree kidnapping conviction required proof that McDowell intentionally abducted Spice—that he restrained her by using or threatening to use deadly force. In contrast, the felony harassment conviction required proof that McDowell knowingly threatened to kill Spice with words or conduct that placed Spice in reasonable fear that the threat to kill her would be carried out. Accordingly, the elements required for each conviction were different. While kidnapping required *intentional restraint* by the use or threat of deadly force, harassment only required that McDowell *knowingly threatened* by words or conduct that placed Spice in reasonable fear. Therefore, each crime required additional proof of a fact—intentional versus knowing

23

conduct—that was not required for the other crime such that they are not the same in law under the *Blockburger* test. Because the offenses are not the same in law, McDowell's second degree kidnapping and felony harassment offenses are presumptively not the same for the purposes of double jeopardy.

c.      Merger

Third, we determine, when applicable, whether the offenses merge. *Arndt*, 194 Wn.2d at 819. The merger doctrine can rebut the presumption that offenses are not the same under the *Blockburger* test. *In re Pers. Restraint of Francis*, 170 Wn.2d 517, 524 n.4, 242 P.3d 866 (2010). "'Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime.'" *Arndt*, 194 Wn.2d at 819 (quoting *Freeman*, 152 Wn.2d at 772-73).

McDowell argues that his convictions merge because the "felony harassment conviction is encompassed within the conviction for second degree kidnapping, which required the use or threat of deadly force to elevate the crime from unlawful imprisonment to second degree kidnapping." Br. of Appellant at 51.

In determining whether the two convictions merge, we look to how the State charged and proved McDowell's offenses. *Francis*, 170 Wn.2d at 523-24; *Freeman*, 153 Wn.2d at 778-79. Because the amended information charged McDowell with first degree kidnapping, we look to how the State proved McDowell's offenses.

The State sought to prove kidnapping and harassment based on similar conduct after the trial court instructed the jury on lesser-included offenses. During closing argument, the State

24

contended that McDowell "intentionally abduct[ed]" Spice "when Mr. McDowell g[ot] his gun from that downstairs bedroom and use[d] it against Ms. Spice." 6 VRP (Dec. 12, 2023) at 635. When the State argued the lesser-included offense of second degree kidnapping, the State noted that "[t]he only thing that must be proved beyond a reasonable doubt with regard to [k]idnapping in the [s]econd [d]egree is that on that date, in Washington, Mr. McDowell intentionally abducted Ms. Spice." 6 VRP (Dec. 12, 2023) at 637. The State argued that McDowell "abducted her downstairs, upstairs, in her car with the use of that firearm, threatening her with deadly force" such that "[k]idnapping in the [s]econd [d]egree would absolutely be proved beyond a reasonable doubt based on this evidence." 6 VRP (Dec. 12, 2023) at 637.

To prove the felony harassment charge, the State contended that "Mr. McDowell knowingly threatened to kill Ms. Spice immediately or in the future . . . through his words and actions." 6 VRP (Dec. 12, 2023) at 647. Specifically, the State discussed how McDowell threatened to kill Spice to prove felony harassment:

> [Spice] said repeatedly that that's what he was saying during the time [McDowell and Spice] were in the downstairs bedroom. He was making more than just threats to kill than just, "I'm going to kill you." He was saying it in ways that would make her believe that he was going to kill her. He demonstrated it through his conduct by firing the gun by her. . . . He actually fires that gun and demonstrates to her that he's willing to go forward with this threat that he's just made to her.

6 VRP (Dec. 12, 2023) at 647-48.

When arguing that McDowell "intentionally abducted" Spice for the kidnapping charge, the State specifically identified how McDowell threatened her with the firearm in various locations. As to the felony harassment charge, the State identified McDowell's verbal threats and emphasized the legitimacy of those threats based on McDowell's conduct, including firing a shot. The State appears to urge this court to parse through McDowell's individual acts when determining

25

which conduct formed the basis for the kidnapping and harassment convictions, but viewing the evidence in this manner would ask that we find the words underlying his threat to be distinct from the conduct legitimizing his threat. Based on how the offenses were proved at trial, the State used the act of threatening to kill Spice with the gun to prove felony harassment as well as elevate unlawful kidnapping to second degree kidnapping. "Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime." *Freeman*, 153 Wn.2d at 772-73. Accordingly, we presume that the legislature intended to punish McDowell's felony harassment through a greater sentence for second degree kidnapping.

The State contends that the offenses should still be punished separately under the "'independent purpose or effect'" exception. Br. of Resp't at 64 (quoting *Freeman*, 153 Wn2d at 773). Under this exception, "offenses may in fact be separate when there is a separate injury to 'the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element.'" *Freeman*, 153 Wn.2d at 778 (quoting *State v. Frohs*, 83 Wn. App. 803, 807, 924 P.2d 384 (1996)).

The State argues that "[t]he kidnapping was designed to restrict Ms. Spice's movement" whereas the harassment "was calculated to induce fear and psychological distress." Br. of Resp't at 64. However, the record shows that McDowell's harassment of Spice facilitated his abduction of Spice—McDowell's threats allowed him to restrain Spice. In order to restrain Spice, McDowell's words and conduct had to threaten deadly force, and there is nothing in the record to suggest that McDowell's threats had any separate purpose or effect beyond restraining Spice. Accordingly, the convictions should merge because the threat to kill used to prove harassment

26

constituted the threat of deadly force required to elevate unlawful imprisonment to second degree kidnapping.

       d.       Other indicators of legislative intent

Finally, we consider "'other indicators of legislative intent'" for clear evidence of the legislature's intent to prohibit separate punishments. *Ray*, 5 Wn.3d at 364 (quoting *Muhammad*, 194 Wn.2d at 621). As previously discussed, neither statute explicitly reflects the legislature's intent to impose or prohibit separate punishments. Kidnapping and harassment are criminalized in different chapters of the RCW, indicating the legislature's intent "to 'protect different societal interests' and authorize separate punishments." *Ray*, 5 Wn.3d at 373 (quoting *Arndt*, 194 Wn.2d at 820). But in RCW 9A.46.060(20)-(22), kidnapping is expressly listed as a prior offense that will elevate harassment to a felony. Kidnapping is explicitly cross-referenced in harassment, which may indicate that the legislature did not intend to authorize separate convictions based on a single act. *See Ray*, 5 Wn.3d at 373. Thus, evidence of legislative intent appears to be mixed.

After applying the four-part analysis to determine whether the convictions violate double jeopardy, we conclude that McDowell's conviction for felony harassment should be vacated because it merges with his second degree kidnapping conviction.

D.    SENTENCE EXCEEDING STATUTORY MAXIMUM

Finally, McDowell argues that he should be resentenced because his current sentence exceeds the statutory maximum. The State concedes that McDowell's sentences for second degree kidnapping and felony harassment exceed the statutory maximum for each crime based on the

27

combination of the base sentence, the firearm enhancement attached to the offense, and the community custody term given on each offense.[5]

Second degree kidnapping is a class B felony with a statutory maximum of 120 months. RCW 9A.40.030(3)(a); RCW 9A.20.021(1)(b). "If the standard range sentence . . . exceeds the statutory maximum sentence for the offense, the statutory maximum sentence shall be the presumptive sentence unless the offender is a persistent offender." RCW 9.94A.533(3)(g). "If the addition of a firearm enhancement increases the sentence so that it would exceed the statutory maximum for the offense, the portion of the sentence representing the enhancement may not be reduced." RCW 9.94A.533(3)(g).

The trial court sentenced McDowell to a standard range sentence of 77 months on the second degree kidnapping conviction and imposed a consecutive 36-month sentence based on the firearm sentencing enhancement. The combination of the 77-month sentence for the second degree kidnapping conviction and the 36-month firearm sentencing enhancement do not exceed the maximum penalty of 120 months. However, the trial court also imposed 18 months of community custody. The addition of the 18 month community custody period results in a total sentence of 131 months. Accordingly, the community custody term of McDowell's sentence must be reduced so that the total sentence does not exceed 120 months. *See* RCW 9.94A.701(10). We accept the State's concession and remand to the trial court to resentence McDowell consistent with RCW 9.94A.701(10). *State v. Boyd*, 174 Wn.2d 470, 473, 275 P.3d 321 (2012).

---

[5] Because we determine that his felony harassment conviction merges with his second degree kidnapping conviction, we do not address McDowell's challenge to his felony harassment sentence.

CONCLUSION

We affirm McDowell's convictions except for his conviction for felony harassment, which should be vacated because it merges with his second degree kidnapping conviction. And because McDowell's second degree kidnapping sentence exceeds the statutory maximum, we remand to the trial court to resentence McDowell consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Cruser, J.

Price, A.C.J.